Lumbermens Mutual Casualty Co., a Mutual Company, Plaintiff-Appellee, v. Ronald Poths, Defendant-Appellant, Lawrence Susmark, et al., Defendants-Appellees.

Gen. No. 68–59.

Second Judicial District.

December 27, 1968.

Dreyer, Foote and Streit, of Aurora, for appellant.

Tyler and Peskind, of Aurora, for appellees.

MR. JUSTICE DAVIS delivered the opinion of the court.

This is a declaratory judgment action wherein the plaintiff, Lumbermens Mutual Casualty Co. (Lumbermens), sought a declaration that Ronald Poths (Poths) was not an insured within the language of its automobile liability insurance policy issued to Lawrence Susmark. Poths, while driving the automobile described in this policy, was involved in an accident wherein the defendants, Mildred E. Maxwell and Kimberly Maxwell, allegedly sustained injuries. They brought suit against Poths to recover damages for such injuries.

Poths tendered the Maxwell complaint to Lumbermens and requested it to defend the suit under the policy in question. Lumbermens accepted with reservation of rights and proceeded with the defense of the suit. Concurrently, it filed this declaratory judgment action.

The insurance policy defines the insured with respect to the owned automobile to include "any person while using the automobile . . . provided the actual use of the automobile is by the named insured or such spouse or with the permission of either."

Lumbermens filed a motion for summary judgment which set forth the above facts and asserted that at the

time when the accident occurred, Poths did not have permission from Lawrence Susmark (Mr. Susmark), the insured, or his wife, Anna Doris Susmark (Mrs. Susmark), to drive the automobile. The motion was supported by the affidavit of the attorney for Lumbermens and by a copy of the policy, the Maxwell complaint, the reservation of rights, and the depositions of Mr. Susmark, Mrs. Susmark, Robert Susmark (Robert), and Poths.

Poths filed an affidavit in opposition to the motion for summary judgment which stated that he and Robert were close friends; that the automobile in question was commonly known as Robert's car; that he thought that Robert owned it; that Robert told him to have an additional key made for his use and he did so in Robert's presence; that on certain occasions before the accident, he and Robert would discuss plans for the evening at the Susmark home and in the presence of Mr. and Mrs. Susmark; that on such occasions upon leaving the home, Robert in no manner sought permission of his parents to drive the car; that Mrs. Susmark once saw him drive the car and she made no comment about it; and that he had driven the car approximately twice a week for a considerable period of time prior to the accident and always with Robert's permission.

An affidavit of Eugene Laky, also filed in opposition to the motion, recited that the automobile was commonly known as Robert's car; that he had driven it with Robert's permission; that on one occasion when Poths was driving the car and he was a passenger, Mrs. Susmark saw Poths drive; and that Poths drove the car into the Susmark driveway and stopped, and Mrs. Susmark made no protest with reference to the fact that Poths was driving.

The depositions of Poths, Robert, Mr. Susmark and Mrs. Susmark will be considered separately.

83

Poths, 16 years of age, stated that he and Robert were close friends; that they went to dances and rode around together; that Robert never told him that there were restrictions on the use of the car; that when he visited at the Susmark home and Robert desired to use the car, Robert would ask either his father or mother for permission to use it; and that on one occasion, Mr. Susmark refused Robert's request to use the car. Poths also stated that he worked on the car with Robert at the Susmark home; that while working on the car he would drive the car forward or backward in the driveway; that Robert taught him to drive the stick shift, but he didn't believe that Robert said anything to his father about this; that he never discussed driving the automobile with Mr. Susmark; that in April of 1966, with Robert's permission, he had a key made for the car; that he had been driving the car while Robert was at work since about January of that year; that Robert would drive the car to work, then park it, and he would drive it as long as Robert was working and didn't need it; that Robert would know in advance when he was going to use the car; that he would ask Robert if he could use it; that he used it with Robert's express permission; that on one occasion, Robert left the key in the car and he drove it from school without Robert's express permission; that he was taking classroom driving at school but did not have a driver's license; that on certain occasions, Robert would tell him not to use the car because he was going to get off early or because something was wrong with it; and that Mrs. Susmark saw him drive the car on one occasion and neither objected nor told him not to drive in the future.

Poths further stated that on April 22, 1966, the date of the accident, Robert asked him if he was going to use the car and he said he wasn't because the transmission was causing trouble; that later Jerry Hulme came to the

theater where he worked and asked for and was refused the key to the car; that Hulme came back later and said that Robert told him that it was all right to get the key; that he then gave Hulme the key and asked him to bring the car back at 9 p. m.; that Hulme returned about 9:30 p. m. with two girls and asked him when he would get off work, and he stated at 10:30 p. m.; and that Hulme came back at that time and he (Poths) got into the car and drove it, and was driving it in Aurora at the time of the accident.

Mr. Susmark, the insured, stated that Mrs. Susmark purchased the car and held title to it; that it was purchased as a second car for Mrs. Susmark and for Robert to use on occasion with permission from his parents; that Robert obtained specific permission from either Mrs. Susmark or himself on each occasion when he used the car; that Robert had no blanket permission to use it; that he had cautioned Robert about letting anyone else drive the car; that on one occasion he saw Poths drive the car in the driveway when the boys were working on it; and that he did not know there was a second key to the car. He also stated that Robert had repaid him for part of the purchase price of the car, and and that it was purchased partly for him to have a car so he could learn how to drive and maintain a car.

In her deposition, Mrs. Susmark stated that the car was purchased by her husband and herself as a car for her and as a car for Robert to work on and use; that Robert had paid for the insurance on the car and had repaid part of the purchase price of the car; that she kept the key in her purse; that Mr. Susmark told Robert that no one other than the three of them was to drive the car; and that she had no recollection of ever seeing Poths drive the car. Her statements concerning Robert's permissive use of the automobile were substantially the same as those of Mr. Susmark. She also stated that she worked

85

evenings on occasion and used the car for shopping; that Mr. Susmark took the train to work and left his car at home.

Robert, a high school senior, stated that the car was purchased as a second family car for his mother; that he could drive it on occasion and could work on it; that he oiled and greased the car and worked on it; that he had to have specific permission from either his father or mother for each occasion when he used the automobile, and he never used the car without such permission; that he never sought permission for anyone else to use it and never told his father or mother that anyone else was driving it; that after his father saw Poths drive the car in the driveway, his father told him that he didn't want Poths to drive the car; that he had no specific understanding with Poths about driving the car; and that he agreed that Poths could use it if he had his specific permission for each occasion.

Robert also stated that he worked on April 22; that he had permission to drive the car to work and did so; that he talked with Poths who said he wasn't going to take the car; that he told Poths that he didn't want him to use it because of trouble with its transmission; that he did not see or give Hulme permission to use the car or get the key; that before going to work, he parked the car in the parking lot and removed the key; and that when he came back about 1:30 p. m., after completing his work, the car was gone. Robert further stated that he had never contributed anything on the purchase price of the car, but did buy gasoline and oil and helped with repairs for it.

A similar declaratory judgment action against the Farmer's Insurance Company was also filed in the Circuit Court of the 16th Judicial District, Kane County, wherein Robert F. Poths, and Ronald W. Poths, a minor, by Robert F. Poths, his father, were plaintiffs. The Poths made a motion to consolidate these actions. The trial court de-

nied the motion but did order the cases consolidated for trial, which was done, and separate judgments were entered in each case.

The trial court entered a summary judgment in the case at bar in favor of Lumbermens and the defendant Poths, appealed.

Poths here urges that the trial court abused its discretion in denying his motion to consolidate the two actions, and that the court erred in entering summary judgment in favor of Lumbermens.

■■ The consolidation of cases is a matter within the discretion of the trial court, and unless that discretion has been greatly abused, this court will not interfere. Black Hawk Motor Transit Co. v. Illinois Commerce Commission, 383 Ill 57, 66, 48 NE2d 341 (1943); Chicago v. Atkins, 19 Ill App2d 177, 180, 153 NE2d 302 (1958). In the case at bar, the trial court denied the motion to consolidate, but did order that the two cases be consolidated for trial. Under these circumstances, we find no abuse of discretion in the denial of the motion.

The entry of summary judgment in favor of Lumbermens presents the issue of whether the trial court erred in holding, as a matter of law, that Poths was driving the automobile in question at the time of the accident without the permission of either Mr. Susmark or his wife.

■ The principles applicable to a motion for summary judgment under section 57 of the Civil Practice Act (Ill Rev Stats 1967, c 110, par 57) are well defined. Summary judgment is a procedure to be encouraged (Allen v. Meyer, 14 Ill2d 284, 292, 152 NE2d 576 (1958)); however, it is a remedy to be awarded with some caution so as not to preempt the right to a trial by jury or the right to fully present the factual basis for a case where a material dispute may exist. Ruby v. Wayman, 99 Ill App 2d 146, 240 NE2d 699, 700 (1968); Solone v. Reck, 32 Ill App2d 308, 310, 311, 177 NE2d 879 (1961); Tezak v. Cooper, 24 Ill App2d 356, 362, 363, 164 NE2d 493 (1960).

Section 57 provides that a summary judgment should be rendered if the pleadings, depositions and admissions on file, together with the affidavits, if any, "show that there is no genuine issue as to any material fact, and that the moving party is entitled to a judgment or decree as a matter of law."

█ Courts have construed this section to mean that in determining if there is a genuine issue as to any material fact, inferences may be drawn from the facts which are not in dispute, and if fair-minded persons could draw different inferences from these facts then a triable issue exists. Ruby v. Wayman, supra, 700, 701; Peirce v. Conant, 47 Ill App2d 294, 300, 198 NE2d 555 (1964).

██ In making the above determination on a motion for summary judgment, the court must construe the pleadings, depositions and affidavits most strictly against the moving party and most liberally in favor of the opponent. Solone v. Reck, supra, 311. A summary judgment should then be granted where the moving party's right thereto is clear and free from doubt. Ruby v. Wayman, supra, 701; Palier v. Dreis & Krump Mfg. Co., 47 Ill App2d 334, 338, 198 NE2d 521 (1964); Solone v. Reck, supra, 310.

█ Applying these principles, we believe that the trial court erred in granting a summary judgment in favor of Lumbermens. The only function of the court, when presented with a motion for summary judgment, is to determine if a genuine issue exists as to a material fact; if not, summary judgment is proper; if so, summary judgment is improper, as the court may not summarily determine a material fact issue. Kamholtz v. Stepp, 31 Ill App2d 357, 367, 368, 176 NE2d 388 (1961).

There is no genuine issue with reference to the fact that on the date of the accident, Robert was granted permission by either his father or mother to drive the car to the placed where he worked. This he did. Later, Jerry Hulme, without permission and by ruse, obtained the key

to the automobile from Poths, who told him to return the automobile by 9 p. m., park it, and return the key. Hulme came back at 9:30 p. m., accompanied by two girls, and asked Poths when he would get off work. Poths told him at about 10:30 p. m., and Hulme said he would be back. Hulme and the girls came back and Poths got in the automobile, drove it, and was driving it at the time of the accident.

Earlier in the afternoon of April 22, Poths told Robert he wasn't going to use the car because of its transmission trouble and Robert said that was good because he didn't want him to use it. Both Poths and Robert stated in substance that Poths would ask permission of Robert, in advance, to use the car, when Robert was at work. Robert said that there was an understanding that Poths would get permission for each occasion when he would use the car.

Thus, the evidence is uncontroverted that Robert had express permission to drive the car to work on the evening in question. He did so, parked it, and removed the key. Likewise, the evidence is undisputed that Hulme had no permission, express or implied, from any source whatsoever, to drive the car; and Poths had no express permission. The right of Poths to drive the car at the time of the accident, if any he had, arose by implication.

█ Implied permission involves an inference or circumstances arising from a course of conduct or relationship between the parties in which there is a mutual acquiescence or lack of objection under circumstances signifying permission. Thus, an implied permission is not confined alone to affirmative action. Orrill v. Garrett, 100 Ill App2d 194, 241 NE2d 1, 3 (1968) ; 5 ALR2d, § 7, p 609.

In Hays v. Country Mut. Ins. Co., 28 Ill2d 601, 192 NE2d 855 (1963), the court set forth the circumstances surrounding the original permission (in the case at bar, permission to Robert) which may support an implication

of authority in the permittee to grant permission to others to use the automobile. At pages 608, and 609, the court stated:

(1) "Thus where the permittee is in every practical sense the owner of the car, and the named insured holds title for convenience, the general custody and control of the permittee is usually held to empower him to grant permission to others within the scope of an omnibus clause, at least in the absence of express prohibition." (Citations.)

(2) "If the original permittee retains control of the car, but turns over its physical operation to a third person while remaining a passenger, an implied permission has been found in the continued use and control of the original permittee." (Citations.)

(3) "Even where the original permittee is not a passenger, an inference of permission has been sustained where the third person is engaged in some errand or activity for the benefit, advantage, or purposes of the original permittee." (Citations.)

(4) "A course of conduct, establishing that the original permittee was allowing third persons to drive with the knowledge of the named insured and without his objection, may also support a finding of implied permission." (Citations.)

Even Poths concedes that the circumstances set forth in (2) and (3) have no application in the case at bar. But, he does urge that the facts and circumstances set forth in the pleadings, depositions and affidavits create a genuine issue as to the material fact concerning whether Poths had implied permission to drive the automobile under the guidelines set forth in (1) and (4).

Guideline (1) presents the questions of whether, under the evidence, there was a dispute as to whether (a) Robert was in every practical sense the owner of the car, and (b) whether there was an express prohibition against him permitting third parties to use the car.

In Hays, under guideline (1), the case of Fireman's Fund Indemnity Co. v. Freeport Ins. Co., 30 Ill App2d 69, 173 NE2d 543 (1961) is cited. In the cited case—an implied permission case—at pages 73 and 74, the court stated that whether or not permission to drive a car exists in any situation is a question of fact; that permission will more readily be implied when the use is for social rather than business purposes; and that permission will be more readily assumed where the permittee has general custody of the car, rather than a limited permission.

Under the evidence, which was conflicting, Robert had made payments to his parents on account of the purchase price of the car; had paid for the insurance, oil and gasoline and had kept it in running condition. These facts indicate that a genuine issue existed on the factual question of whether Robert was in every practical sense the owner of the car, even though there was evidence which would negate ownership in Robert.

The record also indicates that Mrs. Susmark had seen Poths drive the car; that when he drove it into the Susmark driveway, the boys in the car helped Mrs. Susmark take groceries from the other car; and that she did not say anything to Poths relative to the fact that he drove the car. Likewise, Mr. Susmark had seen Poths drive the car in the driveway and had made no protest to him. These circumstances, while negated by Mrs. Susmark, with reference to seeing Poths drive the car, give rise to a genuine issue as to a material fact—whether there was an express prohibition against Poths driving it.

The nature and extent of the permission, if any, which Robert had granted to Poths is not without dispute. Gen-

91

erally, the testimony was that Poths only used the car when Robert was at work and then only with his express permission. However, if such was the circumstance, why did Robert consent to Poths having a duplicate key for the car? Also, Poths testified to an occasion when he used the car without Robert's permission. In connection with these undisputed facts, would reasonable-minded persons draw different inferences?

In making the required determinations in a summary judgment procedure, we must remember that the pleadings, affidavits and depositions must be construed most strictly against the moving party, Lumbermens, and most liberally in favor of the opponent, Poths. Solone v. Reck, supra, 311.

The foregoing facts and circumstances also give rise to a genuine issue of a material fact under guideline (4)— whether such course of conduct established that Robert was allowing third persons to drive with knowledge of the named insured and without his objection.

■ The issue before the court in this summary judgment case was whether there was a dispute as to material facts; and if the material facts were not in dispute, then the issue was whether reasonable minded persons might draw different inferences from such facts. We determine this issue in the affirmative in either event. The purpose of a summary judgment is not to try an issue of fact, but rather, to determine whether one exists. Kamholtz v. Stepp, supra 367.

A party's right to summary judgment should be free from doubt (Ruby v. Wayman, supra, 701); but the record on which the summary judgment was granted in this case, fails to meet this requirement.

Lumbermens, in support of the trial court's ruling, has urged that under the rule announced in Pedrick v. Peoria & Eastern R. R. Co., 37 Ill2d 494, 229 NE2d 504 (1967), the trial court properly granted summary judgment. It is

its contention that under the facts of this case, Poths could never establish the requirements of the Hays guidelines (1) and (4).

However, the issue in the summary judgment case at bar, was not whether Poths could ever establish the requirements of such guidelines. The issue was whether there was a dispute as to the material facts; and, if the material facts were not in dispute, then the issue was whether reasonable minded persons might draw different inferences from such facts. In either event, a triable issue existed and a motion for summary judgment should not have been granted.

In Pedrick, at page 510, the court stated:

"In our judgment verdicts ought to be directed and judgments n. o. v. entered only in those cases in which *all of the evidence*, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors movant that no contrary verdict based on that evidence could ever stand." (Emphasis ours.)

Pedrick contemplates the existence of a triable factual issue which has been or will be heard by a jury. It provides the rule which shall govern in connection with the direction of a verdict. After the denial of a summary judgment herein, the trial of the cause, upon proper demand, could be before a jury. In such event, the court would not be precluded from directing a verdict for Lumbermens, if all the evidence, when viewed in its aspect most favorable to Poths, so overwhelmingly favored Lumbermens that no contrary verdict based on that evidence could ever stand. Ruby v. Wayman, supra, 701.

For the reasons stated above, the summary judgment entered in favor of Lumbermens is reversed and the cause remanded to the trial court for further proceedings.

Reversed and remanded.

SEIDENFELD, J., concurs.

93

MORAN, J., dissents.

MORAN, J., dissenting:

I do not share the same views taken by my learned colleagues in this case and therefore must dissent.

My conclusions of fact are based solely upon the affidavit and deposition of Ronald Poths, the moving party in this appeal, and my conclusions of law are based upon the Hays case, specifically, guidelines (1) and (4) as set forth in the majority opinion.

As to guideline (1), even if we assume that Robert Susmark, the original permittee, is, for every practical sense, the owner of the vehicle in question; that his father or mother held title for convenience; and that Robert Susmark had the general custody and control of the automobile in dispute (Poths deposition stated that every time Robert desired to use the car he had "to get permission to leave and take the car"), still, on the day of the accident, there was a specific understanding that Poths would not use the car. At his deposition, he testified to a conversation with Robert, relating to the use of the car, as follows:

Q What was the conversation about?
A He wanted to know if I was going to use the car and I told him no.
Q Going to use the car that night?
A Yes.
Q And you told him?
A I wasn't going to because we had trouble with it and we only had first gear and third gear, and I didn't want to wreck the transmission any more.
Q Was there any other conversation between you and Robert Susmark on that date?
A I don't believe so.

Even more important is the fact that Poths always had express permission, never implied, when he drove the

Susmark vehicle. At the same deposition, upon being queried on this point, his testimony was as follows:

Q Mr. Poths, you stated in response to Mr. Lindner's question that it was all right with Robert Susmark for you to drive the car when he didn't want to use it himself. Do you remember making that answer to his question?

A Yes.

Q Prior to such use, would you ask his permission, whether you could use it or not?

A Yes, when I knew he was going to be at work, I would ask.

Q So the times that you used it when it was all right with him, it was by his express consent that you use it. Is that correct?

A. Yes.

Q You stated that Mrs. Susmark saw you driving the car. Did she say anything to any other person other than yourself about your driving the car?

A I couldn't say.

Q You stated in response to Mr. Simpson's question that you drove this car from school on one occasion. At that time did you ask Robert's permission to drive the car from school to your home?

A I didn't really ask for permission. I told him I would probably use it.

Q What did he say?

A I can't say for sure. I told him I would probably use the car, and he said okay or something.

Q You don't remember the exact words?

A No, I don't.

It is my opinion that Poths did not qualify under guideline (1).

As to guideline (4), there was no knowledge on the part of Lawrence Susmark, one of the named insured, that Poths was driving the vehicle in question. The follow-

95

ing testimony by Poths at his deposition on this point is clear when he was examined as follows:

Q Did you ever discuss your use of this car with his father, Lawrence Susmark?
A No.
Q Did Lawrence Susmark know that you were using the car?
A No, he didn't.

Mrs. Anna Doris Susmark, mother of Robert, and the other named insured, supposedly saw Poths on one occasion, follow her into the Susmark driveway while Poths was driving the vehicle. Assume that she did see Poths behind the wheel, even though she claims no memory of such occasion; it is my opinion that one act does not constitute a "course of conduct" which would impute "knowledge" to the named insured as required by guideline (4) of the Hays case.

Webster defines "course" as a number of like things in the same regular order; a series. (Webster's New Twentieth Century Dictionary (unabridged) 2nd Ed (1964).) One act does not conform to such definition.

On the night in question, there was definitely no express permission for Poths to use the vehicle and he would necessarily then be dependent upon past performance to establish an implied permission. His own statements, quoted above, indicate that at all times prior to the date of the accident he obtained express permission before driving the vehicle. I am of the opinion that it was incumbent upon Poths to show that he had, previous to the night in question, driven Robert's car, without express permission and to the knowledge of Robert or the named insureds, without objection.

Poths did not do so, and therefore, the trial court was correct in its judgment and I would affirm.