THE MARYLAND CASUALTY COMPANY, Plaintiff-Appellant, *v.* THE IOWA NATIONAL MUTUAL INSURANCE COMPANY *et al.*, Defendants-Appellees.

(No. 11488;

Fourth District—May 16, 1972.

CRAVEN, J., dissenting.

Vance I. Kepley, of Reno, O'Byrne & Kepley, of Champaign, for appellant.

John E. Gambill, of Allen & Korkowski & Associates, of Rantoul, (James R. Blunk, Senior Law Student, of counsel,) for appellees.

Mr. JUSTICE SIMKINS delivered the opinion of the court:

This is an action brought under the provisions of Section 57.1 of the Civil Practice Act by Maryland Casualty Company, the appellant, against the Iowa National Mutual Insurance Company and others for a declaration of its rights and duties under a certain insurance policy. Various other requests for declaratory relief were filed by the defendants and at the close of all the evidence the trial judge, by way of directed verdicts, made certain rulings which are the basis of this appeal. The facts established at the trial are essentially undisputed. It is the application of those facts to certain well-defined rules of law that has engendered this appeal.

On July 21, 1968, Robert E. Smythe of Hoopeston, Illinois, was the owner of two automobiles, one of these automobiles was a 1968 Buick Skylark titled in Robert Smythe and his wife, Mae, and covered by a policy of liability insurance issued by the plaintiff Maryland Casualty Company (hereinafter referred to as Maryland Casualty) wherein Robert Smythe was the named insured. This policy contained the following provision, commonly referred to as an "omnibus clause":

"Persons Insured: Under the liability and medical expense coverages the following are insured:
(a) with respect to an owned automobile
(2) any other person using such automobile with the permission of the named insured, provided his actual operation or (if he is not operating) his other actual use thereof is within the scope of such permission * * *."

Living with Mr. Smythe on the date in question was his twenty year old son, Thomas. Although Thomas did not own an automobile, he was allowed to use either of the family automobiles whenever he desired and

had driven the 1968 Buick on three or four occasions prior to July 21, 1968.

During high school, Thomas had had the use of an automobile owned by his father. On one particular occasion in his senior year Thomas had either loaned this particular automobile to a fellow student or had left the keys in it with the result that a classmate named Charles Knight drove the automobile. When Mr. and Mrs. Smythe learned of this incident they warned Thomas in specific language never to allow anyone other than a member of the family to use a family automobile. Prior to July 21, 1968, this was the only occasion on which Mr. Smythe specifically instructed his son never to allow non-family members to drive a family automobile. On re-direct examination, Mr. Smythe testified as follows:

"Q. Mr. Smythe, did you object to Tom using—let anyone else drive the car?

A. Yes I did.

Q. And can you tell the jury what you meant when you answered Mr. O'Brien's questions he just read from awhile ago, when you said, Tom —when you said Tom was to use his own common sense?

A. After this Knight situation I laid down the rules that nobody in the family would loan anybody a car. I didn't think that I would have to repeat that everytime they went out. I thought his common sense—."

However, an exception to this rule was granted for a friend of the Smythe family, Clem Miller. Clem Miller was a young man who had known the Smythe family since he was 4 or 5 years old. A frequent visitor in the Smythe home, Clem was treated as "one of the family" and was allowed to drive the Smythe family automobiles.

While he was a student at Southern Illinois University in Carbondale, Illinois, Thomas had become friends with two young men whose names were William Horton and John Higgins. Horton lived in Rankin, Illinois, and he and Thomas often drove back and forth to school together. The evidence revealed that the only time Horton had ever been in the Smythe home was on one occasion when he had brought Thomas home from Carbondale. On this occasion he was in the Smythe home for approximately five minutes and met Thomas' father, Robert, and his brother. At that time there was no conversation between Horton and Robert Smythe relative to Horton's use of an automobile owned by the Smythe family. Furthermore, Horton had never met Mrs. Smythe and had never driven an automobile owned by the Smythe family before July 21, 1968.

On July 21, 1968, a Saturday, Thomas Smythe took the 1968 Buick Skylark owned by his father and drove to a party in Boswell, Indiana. At the party he met both William Horton and John Higgins. Horton had

a pick-up truck that was owned by his father, Donald Horton, and John Higgins had driven to the party in his own automobile, a 1964 Chevrolet Impala "SS". During the course of the party Smythe told Horton that "they" had a new automobile, referring to the 1968 Buick. This was the first time Horton had learned that the Smythe family possessed this particular automobile. Called as an adverse witness at the trial by counsel for Maryland Casualty, Horton was asked whether or not Thomas had told him who the automobile belonged to and he replied as follows:

"Well, not * * * exactly. He said something about his dad owned it, and then later on he said something about his mother did. I never paid much attention to him."

At some point during the evening these three young men agreed to meet at a gasoline station in Hoopeston, Illinois, and then proceed to Danville for something to eat. There was also some conversation about trading automobiles for this trip. Smythe had driven Higgins' Chevrolet around Boswell earlier in the evening and testified that he liked to drive this automobile because he wanted to impress some young ladies. Accordingly, Higgins asked Horton if he could drive Horton's pick-up truck to Hoopeston and Horton granted him permission to do so. Shortly after Higgins left, however, Horton changed his mind about going to Danville and asked Smythe to stop Higgins and ask him to return the truck. Smythe then got in Higgins' Chevrolet and caught up with him about two miles outside of Boswell. Higgins refused to drive back to the party and proceeded on to Hoopeston.

When the party was over both Horton and Smythe prepared to leave for Hoopeston. Smythe got into the Higgins vehicle and Horton got into the Smythe Buick. Smythe's testimony indicated that he did not engage in any conversation with Horton about which automobile to drive. Horton, on the other hand, testified that when they left the party Smythe told him that he wanted to drive Higgins' Chevrolet and that Horton should drive the Buick to Hoopeston. At no time during the evening did Smythe ever inform either Horton or Higgins that his father had instructed him never to allow anyone other than a family member to operate the automobile. On the way to Hoopeston, Horton was involved in a collision with another automobile. As a result of that collision a personal injury suit was filed against Horton in the Circuit Court of Vermilion County by Charles B. McElhaney and Harold E. Morlan.

While the Vermilion County suit was pending, Maryland Casualty instituted this declaratory judgment action in the Circuit Court of Champaign County naming as defendants Iowa National, William Horton, Charles B. McElhaney and Harold E. Morlan. At the time of the collision in question William Horton's father was insured by a policy of liability

insurance issued by Iowa National which contained the following language:

"Persons insured: Under the liability and medical expense coverage, the following are insureds:

(b) with respect to a non-owned automobile,

    (1) the named insured,

    (2) any relative, but only with respect to a private passenger automobile or trailer, provided his actual operation or (if he is not operating) the object actual use thereof is with the permission, *or reasonably believed to be with the permission, of the owner* and is within the scope of such permission, and

    (3) any other person or organization not owning or hiring the automobile, but only with respect to his or its liability because of acts or omission of an insured under (b)(1) or (2) above." (Emphasis added).

In its complaint, Maryland Casualty prayed for a determination that it was not obligated under its policy with Robert Smythe to defend or indemnify William S. Horton from the suit filed against him by Charles B. McElhaney and Harold E. Morlan. William Horton filed an answer denying the allegations of Maryland Casualty's Complaint and requested the Court to declare his rights as an insured under the policy issued by Iowa National. The other named defendants also answered the complaint and sought a declaration that between Maryland Casualty and Iowa National, one company be declared the primary insurer of William S. Horton and one company the excess insurer.

At the close of all the evidence the trial judge entered directed verdicts declaring that as a matter of law Maryland Casualty was the primary insurer of William Horton and Iowa National was the secondary or excess insurer. Both Maryland Casualty and Iowa National have appealed from these rulings.

■■ Initially, we note that the standard the trial court was required to follow in determining whether or not to direct a verdict is the *"Pedrick Rule"* enunciated by the Supreme Court as follows:

"In our judgment verdicts ought to be directed and judgments *n.o.v.* entered only in those cases in which all of the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors movant that no contrary verdict based on that evidence could ever stand." *Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill.2d 494, 510, 229 N.E.2d 504, 513-14.

With this in mind, we are of the opinion that the trial court erred in directing verdicts in both instances.

## I. *The Appeal of Maryland Casualty.*

■■ The omnibus clause of the policy issued by Maryland Casualty to Robert Smythe afforded coverage to any person using or operating the automobile in question with the permission of the named insured, Robert Smythe. There is no question, therefore, that if Thomas Smythe had been involved in a collision on the day in question he would have been covered by Maryland Casualty's policy since the record clearly reveals that he had permission from his father to use the automobile. Thomas Smythe occupied the position of the "original" or first permittee. However, at the time of the collision the Smythe Buick was being operated by William Horton, the "subsequent" or second permittee. The question presented by this portion of the appeal is whether or not William Horton, the subsequent permittee, was using or operating the automobile in question with the permission of Robert Smythe, the insured, at the time of the collision. Normally, the claimant under a policy of insurance "bears the burden of Proof on the question of coverage." (*Hays v. Country Mutual Ins. Co.* (1963), 28 Ill.2d 601, 605-06, 192 N.E.2d 855.) Here, since suit was instituted by the insurer, Maryland Casualty bore the burden of proving that William Horton was not an insured under the policy.

■■ The law in Illinois with respect to coverage of a subsequent permittee under an omnibus clause of an insurance policy was set forth by the Supreme Court in *Hays v. Country Mutual Ins. Co.* (1963), 28 Ill.2d 601, 192 N.E.2d 855.[1] A detailed discussion of the factual situation presented in *Hays* would unduly prolong this opinion. Suffice it to say that in *Hays* the Supreme Court noted that a subsequent permittee could be covered under the terms of an omnibus clause similar to the one in question if there was either express or implied permission from the named insured and enumerated four factual situations in which implied permission from the named insured and enumerated four factual situations in which implied permission could be established. Hence, in any given case involving a subsequent permittee under an omnibus clause four hypothetical alternatives could be present: (1) The named insured expressly prohibited the original permittee from allowing third persons to use or operate the insured vehicle; (2) The named insured neither expressly prohibited, nor expressly allowed the original permittee to grant the use of the insured vehicle to third persons; (3) The named insured expressly authorized the original permittee to grant third persons permission to use

---

[1] *Hays,* its progeny and the problems that have occurred in omnibus clause litigation were recently discussed in Larrabee, *"Who's Aboard the Omnibus? The 'Additional Permittee' Rule Re-examined."* 60 ILL. BAR J. 470 (Feb., 1972).

or operate the insured vehicle; and (4) the circumstances surrounding the initial grant of permission from the named insured to the original permittee are such that the original permittee was clothed with implied authorization to grant third persons permission to use or operate the insured vehicle.

With respect to the first alternative, the record in this case clearly revealed that on at least one prior occasion the named insured, Robert Smythe, expressly prohibited the original permittee, Thomas Smythe, from allowing third persons to use or operate family automobiles. At the time of the collision in question, July 21, 1968, Thomas Smythe was twenty years of age. Thomas, his father and his mother all testified that when Thomas was a senior in high school another boy had driven a family automobile that had been entrusted to Thomas' care. When Mr. and Mrs. Smythe learned of this, they informed Thomas that "it better not happen again" (Mrs. Smythe) and that "under no circumstances was he to loan the car to anyone" (Mr. Smythe). This unrebutted evidence without more, would have been sufficient to direct a verdict in favor of the Plaintiff, Maryland Casualty, since it established that the named insured expressly prohibited the original permittee from ever allowing a third person to use or operate a family vehicle. However, the record in this case also revealed that this was the only occasion on which Robert Smythe ever expressly prohibited Thomas from allowing others to use a family automobile. As we have noted earlier, Mr. Smythe felt that he did not have to repeat his prohibition each time Thomas used a family automobile and felt that Thomas would use his "common sense." Viewing this evidence in its aspect most favorable to the defendants, we cannot declare that Maryland Casualty would have been entitled to a directed verdict on the theory of express prohibition by the named insured. The fact that Mr. Smythe's prohibition had been announced several years prior to July 21, 1968, and never renewed, coupled with the fact that Clem Miller was allowed to drive Smythe family vehicles, could have led the jury to determine that Mr. Smythe's prohibition was no longer effective.

██ Assuming, then, that on the date in question, Thomas Smythe was not expressly prohibited by his father from granting third persons permission to use or operate the Buick Skylark, does the absence of an express prohibition, standing alone, create an implied permission from the insured that the original permittee may loan the vehicle to third persons? We feel that it does not. In *Hays*, the Supreme Court noted that "the plaintiff's claim could be sustained only by holding that the insured's permission granted to one user inherently carries with it, without more, a delegation of authority to the permittee to grant permission to a third

person to use the vehicle. So to regard the permission granted by the permittee as 'the permission of the Insured named in this policy' would constitute a substantial departure from the ordinary meaning of the words of the policy * * *." (*Hays v. Country Mutual Ins. Co.* (1963), 28 Ill.2d 601, 606, 192 N.E.2d 855. See also, *Midwest Contractors v. Bituminous Casualty Corp.* (1st Dist., 1969), 112 Ill.App.2d 134, 140, 251 N.E.2d 349.) The law in this regard was correctly summarized by the Second District in *Hanegan v. Horace Mann Mutual Ins. Co.* (1966), 77 Ill.App.2d 142, 150, 221 N.E.2d 669, where the Court wrote:

"The best that can be said from the evidence in this case is that since the insured did not expressly prohibit the permittee from allowing third persons to drive his automobile, an implied permission should be found. Such a result would not only add to the categories enumerated by our Supreme Court in the *Hays* case, but go beyond what to date has been the law in Illinois."

Therefore, even assuming that on July 21, 1968, Thomas was not expressly prohibited from loaning the Smythe Buick to third persons that fact alone does not create an implication that he did have his father's authorization to grant such permission to others and bring them within the omnibus coverage.

■■ Assuming, then, that Robert Smythe's earlier express prohibition was no longer valid and given the fact that the absence of either an express prohibition or an express permission does not create permission by implication, the only way William Horton could come within the coverage afforded by Maryland Casualty's omnibus clause was to have either the express or implied permission of Robert Smythe. There is no doubt that Robert Smythe never gave William Horton express permission to use the Smythe Buick. There is also positive evidence that Robert never gave Thomas, the original permittee, express permission to allow others to drive the family car. The only evidence that was presented on this point revealed that on the one occasion when Thomas did allow a third person to use a family automobile he was instructed by his father never "to loan the car to anyone." The singular exception to this rule was in the case of Clem Miller who was treated like "one of the family." Hence, viewing all of the evidence most favorable to the defendants we are convinced that a jury could never find that Robert Smythe had expressly granted Thomas authority to permit third persons to use and operate a family vehicle.

■■ Therefore, the only possible method whereby William Horton could have been covered by Maryland Casualty's policy is if he was operating the automobile in question with the implied permission of Robert Smythe. The Supreme Court in *Hays v. Country Mutual Ins. Co.,* 28 Ill.2d 601,

608, 609, set forth four circumstances under which an implication of authorization from the insured to the original permittee could be found:

"Of course the named insured may by express authorization delegate to his permittee the power to grant permission to others, and circumstances surrounding the original permission may support an implication of such an authorization. Thus where the permittee is in every practical sense the owner of the car, and the named insured holds title for convenience, the general custody and control of the permittee is usually held to empower him to grant permission to others within the scope of an omnibus clause, at least in the absence of express prohibition. (See, e.g., *Hinckley v. National Surety Co.* (1955), 99 N.H. 373, Ill.A.2d, 827; *Fireman's Fund Indemnity Co. v. Freeport Insurance Co.*, 30 Ill.App. 2d, 69; *cf. Norris v. Pacific Indemnity Co.* (1952), 39 Cal.2d 420, 247 P.2d 1.) If the original permittee retains control of the car, but turns over its physical operation to a third person while remaining a passenger, an implied permission has been found in the continued use and control of the original permittee. (See *Standard Accident Insurance Co. v. New Amsterdam Casualty Co.* (7th Cir., 1957), 249 F.2d 847; *Fireman's Fund Indemnity Co. v. Freeport Insurance Co.*, 30 Ill.App.2d 69.) Even where the original permittee is not a passenger, an inference of permission has been sustained where the third person is engaged on some errand or activity for the benefit, advantage, or purposes of the original permittee. (See *Aetna Life Insurance Co. v. Chandler* (1937), 89 N.H. 95, 193 Atl. 233.) A course of conduct, establishing that the original permittee was allowing third persons to drive with the knowledge of the named insured and without his objection, may also support a finding of implied permission. See, e.g., *Odden v. Union Indemnity Co.* (1930), 156 Wash. 10, 286 Pac. 59; *Shoup v. Clemans* (1939) (Ohio App.), 31 N.E.2d 103; *cf. Goff v. New Amsterdam Casualty Co.* 318 Ill.App. 586."

■■ The evidence elicited in this case revealed that Thomas Smythe was not "in every practical sense the owner of the car". On the contrary, the automobile was purchased by Mr. and Mrs. Smythe primarily for the purpose of providing a means of transportation for Mrs. Smythe. The Smythe family lived in Hoopeston where Mr. Smythe ran a restaurant. Mrs. Smythe was a school teacher who was employed in Danville, Illinois, and the automobile was intended for her use in driving back and forth to work. In fact, Thomas had only driven the vehicle three or four times prior to the evening in question. It is also clear that Thomas did not remain a passenger in the Buick after he turned its physical operation over to William Horton. Therefore, neither of the first two categories

of "implied permission" enumerated in *Hays* have any application to the facts of this case.

We can state with equal assurance that the fourth category set forth in *Hays* finds no support in the record below. There is no evidence that Thomas Smythe was allowing third persons to operate the 1968 Buick or any family-owned automobile with the knowledge of Robert Smythe and without his objection. As we have previously noted, on the one occasion when Thomas did allow a high school classmate to use a family automobile his father not only admonished him for his conduct but also instructed him never to loan a family vehicle to anyone.

■■ This brings us to the final category of "implied permission" mentioned by the Supreme Court in *Hays*, the "benefit" theory. During its discussion of those circumstances where the permission of the insured may be implied to the subsequent permittee the Court noted that "[e]ven where the original permittee is not a passenger, an inference of permission has been sustained where the third person is engaged on some errand or activity for the benefit, advantage, or purposes of the original permittee." (*Hays v. Country Mutual Ins. Co.* (1963), 228 Ill.2d 601, 609, 192 N.E.2d 855, 860.) Thus, in the present case the only conceivable manner in which William Horton could have been driving the Smythe automobile with the implied permission of Robert Smythe is if his trip from Boswell, Indiana, to Hoopeston, Illinois, was for the "benefit, advantage or purposes" of Thomas Smythe, the original permittee. The trial court, in directing a verdict against Maryland Casualty at the close of all the evidence, found as a matter of law that Horton did have the implied permission of Robert Smythe to drive the 1968 Buick at the time of the collision in question because he was "engaged in an errand or activity for the benefit of the original permittee, Thomas Smythe." The trial court erred in this finding. Under the facts of this case we feel constrained to hold that William Horton's trip was not for the benefit of Thomas Smythe and, therefore, he was not operating the automobile with the implied permission of Robert Smythe.

In support of the "benefit theory" of implied permission the Supreme Court in *Hays* cited *Aetna Life Ins. Co. v. Chandler* (N.H.S.Ct., 1937), 193 A. 233. *Chandler* was an action for declaratory relief brought by Aetna to determine insurance coverage under the provisions of an omnibus clause of a policy it had issued to the defendant Chandler. The omnibus clause provided, in part, that coverage would extend to persons operating the vehicle in question "with the permission of the named Assured." (*Aetna Life Ins. Co. v. Chandler* (N.H.S.Ct., 1937), 193 A. 233, 235.) The insured, Chandler, had given permission to her friend,

Miss Harriman, the original permittee, to operate the insured vehicle. Harriman worked in another town and would frequently drive the vehicle in question back and forth to work. When the weather became inclement Harriman would remain in the town where she worked and would store the Chandler vehicle in a garage rented for that purpose. On one particular evening Miss Harriman became ill and sent her friend, William Rand, the subsequent permittee, out to purchase some medicine. While Rand was so engaged he became involved in a collision with an automobile operated by Wallace Randall. The Court discussed the issue in terms of a bailor-bailee relationship and declared that "coverage of the policy extended to the bailee's agent, through whom at the time of the accident that bailee was making a reasonable use of the car for her urgent needs." (*Aetna Life Ins. Co. v. Chandler* (N.H.S.Ct., 1937), 193 A.233, 236.) Thus the "benefit" received by the original permittee in *Chandler* from the subsequent permittee's operation of the insured vehicle took the form of an urgent, tangible service—the procurement of medicine.

There have been two Illinois cases subsequent to the Supreme Court's decision in *Hays* that have discussed the "benefit" theory of implied permission. The first case (*Hanegan v. Horace Mann Mut. Ins. Co.* (2nd Dist., 1966), 77 Ill.App.2d 142, 221 N.E.2d 669), arose when an automobile owned by Charles Mellinger and insured by The Farmers Automobile Insurance Association (Farmers) collided with a vehicle owned by one Robert Hart. On the day in question, Gary Mellinger, the seventeen year old son of Charles, had taken his father's car to go to the barber shop for a haircut. Although Gary had received no specific permission from his father to use the automobile he was generally given the keys to the Mellinger car whenever he asked to use it. Mr. Mellinger had never given his son any "instructions concerning the automobile's use by someone else." (*Hanegan v. Horace Mann Mutual Ins. Co.* (2nd Dist., (1966), 77 Ill.App.2d 142, 145, 221, N.E.2d 669.) Gary left his home and proceeded to pick up James Hanegan and two other young friends on his way to the barber shop. When they arrived at the shop, Hanegan asked Gary if he could use the Mellinger vehicle to get something to eat. Gary consented, and Hanegan thereafter drove out of the parking lot and collided with the Hart vehicle. At the time of the collision young Hanegan's father carried insurance with the Horace Mann Mutual Insurance Company (Horace Mann).

The policy issued by Farmers contained an omnibus clause which provided coverage to "any other person using such automobile, provided the actual use thereof is with the permission of the named insured." (*Hanegan v. Horace Mann Mut. Ins. Co.* (2nd Dist., 1966), 77 Ill.App.2d

142, 143, 221 N.E.2d 669.) Horace Mann's policy was quite similar in that it "contained a provision defining insured with respect to a nonowned automobile as, "* * * the named insured, any relative, * * * provided the actual use thereof is with the permission of the owner, * * *'" 77 Ill.App.2d at 144.

Robert Hart then instituted a lawsuit against James Hanegan for the property damage to his automobile. After both Farmers and Horace Mann refused to defend him, Hanegan retained private counsel and a judgment was entered in favor of Hart. Hanegan then filed an action against both insurance companies seeking as damages the amount of the judgment plus interest, costs and attorneys fees. The trial court ruled in favor of Hanegan and declared that Farmers was responsible for two-thirds of the judgment and Horace Mann was accountable for one-third. Both companies appealed.

After reviewing the factual situation noted above, the Court quoted at length from *Hays v. Country Mutual Ins. Co., supra,* and analyzed the facts in light of the guidelines established by *Hays.* Since the insured, Charles Mellinger, had not given the subsequent permittee, James Hanegan, any express permission to use the Mellinger car, Hanegan could have been afforded coverage under the policies in question only if he had been operating the vehicle with the implied permission of Charles Mellinger. The Court examined the language of *Hays* on the subject of implied permission and declared that there was no inference of implied permission from Charles Mellinger to James Hanegan. With respect to the "benefit" theory, the Court wrote:

"We do not believe that Gary Mellinger had any obligation either social or otherwise to accommodate the desire of the plaintiff and the other boy to have something to eat and we cannot see that their taking the car to a restaurant while Gary was getting a haircut was in any way a convenience for him." *Hanegan v. Horace Mann Mut. Ins. Co.* (2nd Dist., 1966), 77 Ill.App.2d 142, 150, 221 N.E.2d 669.

The subsequent permittee in *State Farm Mutual Auto. Ins. Co. v. Mohan* (3rd Dist., 1967), 85 Ill.App.2d 10, 228 N.E.2d 283, was an employee of a body shop to whom the original permittee had entrusted the insured vehicle for the purpose of repairing a dent in the hood. The insured had neither expressly prohibited nor expressly permitted the original permittee from granting permission to third parties to drive the insured vehicle. Instead of taking the automobile immediately to the body shop, the subsequent permittee took his girl friend on a tour of some local night spots. He was subsequently involved in a collision which took the life of his girl friend. State Farm Mutual Insurance Company (State Farm), the liability insurer of the subsequent permittee

(Donahue), thereafter instituted a declaratory judgment action against U.S. Fidelity and Guaranty Company (U.S.F. & G.), the liability insurer of the owner of the vehicle (Midway), against Universal Underwriters Insurance Company (Universal), the liability insurer of the original permittee (Stevenson), and others for a construction of the various policies and a declaration of rights.

"At the time of the occurrence, plaintiff had in effect a liability policy in which Donahue was the named insured. The policy included the operation of Donahue's personal car (not herein involved) and included Donahue's use of a non-owned vehicle used with the permission of the owner or person in lawful possession thereof. Coverage was excluded with respect to the use of a nonowned automobile while being used in an automobile business.

U.S.F. & G. had a liability policy in effect, with Midway being its named insured and describing the automobile involved herein. The policy contained the usual and customary omnibus clause which included coverage while the described automobile was being used by another with the permission of the named insured and excluding coverage while the autombile was being used in the automobile business.

Universal had a liability policy in effect, with Stevenson being the named insured, and the insuring clauses of the policy including losses resulting from the operation of automobiles owned by Stevenson and nonowned automobiles when operated by agents or employees of Stevenson." *State Farm Mutual Ins. Co. v. Mohan* (3rd Dist., 1967), 85 Ill.App.2d 10, 14, 228 N.E.2d 283.

The Court upheld the ruling of the trial judge that the subsequent permittee was operating the insured vehicle with the implied permission of the owner at the time the collision occurred and was, therefore, covered by the omnibus clause of the policy issued by U.S.F. & G. After reviewing the Supreme Court's language in *Hays*, the Court held that "Donahue's permission for the use of the automobile was for the benefit, advantage or purpose of Stevenson, the original permittee." (*State Farm Mutual Ins. Co. v. Mohan* (3rd Dist., 1967), 85 Ill.App.2d 10, 19, 228 N.E.2d 283.) Here again, the intended "benefit" to be received by the original permittee was a definite, tangible service—the repair of the insured vehicle.

The evidence contained in the record of this case does not support a holding that William Horton was "engaged on some errand or activity for the benefit, advantage or purposes of the original permittee," Thomas Smythe. (*Hays v. Country Mutual Ins. Co., supra.*) The record indicates that these three young men, Smythe, Horton and Higgins, had simply agreed to swap or trade vehicles with each other for the purpose of driv-

ing to Hoopeston. This is supported by the testimony of Smythe who stated as follows:

"Q. Some time later in the evening did you and Mr. Higgins and Mr. Horton engage in a conversation concerning your automobiles?

A. There was some conversation about trading cars to go to the Standard Station in Hoopeston, and then meet up again and go to Danville. I know there was a conversation about trading cars, but I don't remember any of the particulars or what was said, or what was said to who. But I know that there must have been— there was conversation about trading cars, everybody swapping off with each other."

After this conversation took place, Higgins left the party in the pick-up truck that belonged to Horton's father. The events that transpired at the conclusion of the party were related by Smythe in the following manner:

"Q. All right. Now later on in the evening the party was over, I take it?

A. Yes sir.

Q. And you and Mr. Horton and the rest of them were leaving?

A. Yes.

Q. Now will you tell us what happened just prior to you leaving the party between you and Mr. Horton?

A. We just walked out of the trailer and got into—I got in Mr. Higgins' car and he got in my father's car and we just left.

Q. Where were you going?

A. To Hoopeston.

Q. Both of you were going to Hoopeston?

A. Yes, to my understanding.

Q. And you got into the Higgins' car?

A. Yes.

Q. Was there any conversation between you and Mr. Horton regarding which car you were going to drive?

A. No.

Q. You just walked to the Higgins' car?

A. Yes sir.

Q. And got in it?

A. Yes."

William Horton, on the other hand, testified that when they left the party Thomas specifically asked him to drive the 1968 Buick because Smythe wanted to drive Higgins' 1964 Chevrolet:

"Q. You and Tom walked out of the trailer together?

A. Yes. Tom walked out before I did. I was—.

Q. Tom walked out first. You were behind?

A. Yes.

Q. Tom—where did Tom go?

A. He walked over to John's car.

Q. He walked over to John's car. Where did you go?

A. I was walking right behind him, to John's car. And Tom got in the driver's side and said, I'm going to drive John's car. You take, uh, my car.

Q. Was he inside the car when he said that?

A. Uh, no, he had the door open. He hadn't gotten in the car yet.

Q. Now what did he say?

A. He said, I wanted to drive John's car. He said he wanted to drive John's car. He told me to take his car."

At any rate, it is clear that William Horton was driving the Smythe Buick at the time the collision occurred because Higgins had left with the Horton pick-up truck and Smythe wanted to drive the Higgins Chevrolet. Conceivably, Horton's use of the Buick might have constituted some type of benefit to Smythe, the original permittee, in that it allowed Smythe to drive Higgins' Chevrolet. We do not, however, feel that this type of activity was the kind of "benefit" contemplated by the Supreme Court in *Hays*. Horton's operation of the Smythe automobile at the time in question was not intended to bestow any type of benefit upon Smythe; it was merely part of an arrangement between Higgins, Horton and Smythe to swap or trade vehicles. Horton was not engaged on any type of mission or activity for Smythe at the time of the collision. He was using the Smythe Buick to travel from Boswell, Indiana to Hoopeston, Illinois.

A somewhat similar situation was faced the United States Court of Appeals for the Fourth Circuit in *Farmer v. Fidelity & Casualty Co. of New York* (1957), 249 F.2d 185. This case was an action for declaratory judgment brought by Fidelity & Casualty Company of New York (Fidelity) for a determination of its rights and liabilities under the omnibus clause of a policy issued to Moses Jeffreys who lived on a farm near Milton, North Carolina. This cause contained the usual wording that coverage extended to third persons provided their actual use of the automobile was with the permission of the named insured. Moses Jeffreys had a nineteen year old son, Walter, who was permitted to use the insured vehicle. However, "both father and son testified unequivocally that Walter was always required to ask permission before each use of the automobile, and that he was frequently admonished by his father never to lend it to anyone or to let anyone else drive it." (*Farmer v. Fidelity & Casualty Co. of New York* (4th Cir., 1957), 249 F.2d 185, 187.) Despite his father's admonitions, on May 12, 1956, Walter drove the insured vehicle to a nearby town and exchanged automobiles with his cousin, James

Jeffreys. James then proceeded for some undisclosed purpose to Danville, Virginia, and on his return was involved in a collision. "Walter was not then in the car, and the mission in which James was engaged was not one for Walter." Furthermore, it was clear that the trip James was engaged in "had nothing to do with any purpose of Moses Jeffreys." (*Farmer v. Fidelity & Casualty Co. of New York* (4th Cir., 1957), 249 F.2d 185, 187.) On these facts the district court held that James was not an insured under the omnibus clause of the policy issued by Fidelity.

This decision was affirmed on appeal. The Court began by observing that there has been a tendency to give the provisions of an omnibus clause a liberal interpretation in favor of the insured. In line with this policy of liberal interpretation,

"* * * Courts have laid down the reasonable rule that permission need not be express but may be implied from circumstances. For example, when the owner of an insured automobile was in jail and his brother drove the car to the mother's home to arrange for her presence at the owner's trial, the mission being one so clearly in his interest, the circumstances were held to imply permission, although the insured had no actual knowledge of the use being made of the automobile. (*American Automobile Insurance Company v. Fulcher*, 4 Cir., 1953, 201 F.2d 751.) So, also, if one were suddenly to become ill and fall unconscious, even a volunteer undertaking to use that person's automobile to bring medical help, would hardly be deemed beyond the coverage of the omnibus clause on the ground that the insured had not expressly authorized the use. Permission could fairly be implied from the circumstances." *Farmer v. Fidelity & Casualty Co. of New York* (4th cir., 1957), 249 F.2d 185, 188.

However, the Court then went on to declare that:

"We know of no case, however, that goes to the extent of allowing an inference of permission in definance of uncontradicted testimony * * * that permission was not only withheld but that lending was specifically forbidden. Even a liberal construction of the policy's provisions will not justify disregard of its plain limitations. *Id.*"

In its brief on appeal, Iowa National relied heavily on the distinction that has been recognized between the meanings of the words "use" and "operate".[2] (*Orrill v. Garrett* (4th Dist., 1968), 100 Ill.App.2d 194, 197-99, 241 N.E.2d 1.) This distinction is not dispositive of the question

---

[2] In support of their position on this point, counsel for Iowa National quoted extensively from *Baesler v. Globe Indemnity Co.*, 162 A.2d 854, decided by the Supreme Court of New Jersey in 1960. *Baesler* was also relied upon and quoted by counsel for Maryland Casualty. Unfortunately, *Baesler* was specifically overruled by the same court in *Odolecki v. Hartford Accident & Indemnity Co.* (1970), 264 A.2d 38, 42, approximately one year before briefs were filed by counsel in this case.

presently before us. We are concerned with the question of *permission*—under the facts of this case did William Horton have the express or implied permission of Robert Smythe to use or operate the insured vehicle? While the distinction between "use" and "operate" may be helpful in determining the kind of permission or the scope of permission, it does not bear upon the essential question of whether or not permission was granted in the first place. Thus, in *Hays*, the Court wrote:

> "The interests both of the insured and of the insurance company center upon the identity of the permittee, his relation to the insured and his ability and responsibility as a driver. The use to which he puts the vehicle while it remains in his control may be regarded as of secondary importance to the question of coverage." *Hays v. Country Mutual Ins. Co.* (1963), 28 Ill.2d 601, 608, 192 N.E.2d 855.

And in *State Farm Mutual Auto Ins. Co. v. American Cas. Co.* (W.Va. S.Ct., 1966), 146 S.E.2d 842, 852, the Court, in denying coverage to a subsequent permittee under an omnibus clause remarked that:

> "It is contended in behalf of State Farm that implied permission of the named insured is established by the fact that, in going to purchase gasoline for use in the automobile, Jefferson was using the vehicle for the benefit of the first permittee, perhaps for the mutual benefit of all of the three young men; and that the use in that respect was within the range of the *purpose* of the express permission given by the named insured to his son. The language of the omnibus clause requires that the actual use of the vehicle be with the "permission" of the named insured. The omnibus clause is not predicated upon the nature of the use contemplated by the initial permission."

■■■ Maryland Casualty has urged that we reverse the decision of the trial court or, in the alternative, to remand the case for submission of the issue to a jury. Unlike the situation that confronted the court in *Lumberman's Mutual Casualty Co. v. Poths* (2nd Dist., 1968), 104 Ill.App.2d 80, 243 N.E.2d 40 and *Poths v. Farmers Ins. Exchange* (2nd Dist., 1969), 104 Ill.App.2d 455, 244 N.E.2d 632, we have all of the facts before us and can, therefore, determine the propriety of a directed verdict. As we have noted, the only possible manner in which William Horton could be covered under the omnibus clause of the policy issued by Maryland Casualty is if his driving of the Buick from Boswell to Hoopeston was for the purpose of conferring a benefit on Thomas Smythe. We have held that it was not. Furthermore, in viewing all of the evidence in a light most favorable to the defendants we feel that the evidence so overwhelmingly favors Maryland Casualty that no contrary verdict based on that evidence could ever stand. Accordingly, the judgment entered against Maryland Casualty is reversed.

II. *The Appeal of Iowa National*

The policy issued by Iowa National to William Horton's father, Donald, contained a clause which provided coverage to any relative using a non-owned automobile if his "actual operation or  *  *  *  other actual use thereof is with the permission, or reasonably believed to be with the permission, of the owner  *  *  *" This type of clause has been termed an "additional insuring clause" and its relationship with the typical omnibus clause has been described by one court in the following manner:

"The development of rules concerning permission has been occasioned by the common use of omnibus clauses in insurance policies whereby persons using motor vehicles described in the policy with the permission of the named insured are declared to be additional insureds under the policy. Another provision also commonly employed is an additional insuring clause which affords coverage when the loss arises from the named insured's use of a motor vehicle of another with the latter's permission. The two provisions are complementary and designed to afford broad coverage. Permission is a common element of both provisions since each depends either on the permission of the named insured or the owner of the vehicle." *State Farm Mut. Auto. Ins. Co. v. Mohan* (3rd Dist., 1967), 85 Ill.App.2d 10, 16, 228 N.E.2d 283.

The only difference between the "permission" required by the omnibus clause of the policy issued by Maryland Casualty and the "permission" required by the additional insuring clause of Iowa National's policy is that the former is objective and the latter can be either objective or subjective. Under Maryland Casualty's policy William Horton could only become an insured if he had the permission of Robert Smythe to operate the 1968 Buick. On the other hand, Horton could have become an insured under Iowa National's policy if he did in fact have Robert Smythe's permission to operate the Buick *or* if he "reasonably believed" he had the permission of Robert Smythe to use or operate the Buick. Since we have held that Horton did not have either the express or implied permission of Smythe to drive the insured vehicle, he could only come within the coverage afforded him by the Iowa National policy if under the facts he "reasonably believed" he had Robert Smythe's permission to drive the Buick. The trial court found, as a matter of law, that Horton "reasonably believed that he was driving the 1968 Buick automobile with the permission of Robert E. Smythe at the time and place alleged in the Amended Complaint." This finding was erroneous.

Because of the fact that the test of coverage under Iowa National's policy is subjective, we have thoroughly reviewed the record with special emphasis on the testimony of William Horton. (*Cf., General Ins. Co. of America v. Thielepape* (5th Cir., 1968), 400 F.2d 852, 853, where the

Court, in upholding a decision of the district court that a subsequent permittee was covered under policy language identical to that in question, declared that its "conclusion is influenced in part by the highly subjective nature of the issue confronting the lower court in determining whether *Thielepape* reasonably believed he was driving the car with the permission of the owner. In a case of this nature the appearance and demeanor of the witnesses is of particular significance.") There is absolutely no evidence in the record upon which William Horton could have formed any reasonable belief that he was operating the 1968 Buick with the permission of Robert Smythe, or Mae Smythe, the owners of the automobile. He had only met Mr. Smythe on one occasion and had never driven an automobile owned by the Smythe family prior to July 21, 1968. He had never engaged in any discussion with either Robert Smythe or his wife, Mae, relative to his use of a Smythe automobile. In short, William Horton had no contact with either Mr. or Mrs. Smythe before the collision except for the one brief instance when he was introduced to Mr. Smythe by Thomas after he had brought Thomas home from college. There is nothing in the record that would indicate that Thomas lead Horton to believe that the Buick belonged to him. When asked whether or not Thomas ever told him who the Buick belonged to, Horton replied that Thomas first said his father owned it and later stated that his mother was the owner.

We have been unable to discover any Illinois cases that have dealt with a clause similar to that found in Iowa National's additional insuring clause. There have been courts in other jurisdictions, (*Benoit v. Fuselier* (La.App., 1967), 195 So.2d 679; *Indiana Lumbermen's Mutual Ins. Co. v. Hartford Accident & Indemnity Co.* (Tex.App., 1970), 454 S.W.2d 781, and on the federal level, *General Ins. Co. of America v. Thielepape* (5th Cir., 1968), 400 F.2d 852, that have had the occasion to pass upon language identical with that found in the policy issued by Iowa National. These cases, however, possess little value as precedent since each one turns upon its peculiar factual situation.

■■ Iowa National has requested that the order of the trial court directing a verdict against it be reversed. We concur in this result. Even when all of the evidence in this case is viewed in its aspect most favorable to the other defendants and to Maryland Casualty, it still so overwhelmingly favors Iowa National that no other judgment could ever stand. Therefore, the judgment entered against Iowa National is reversed.

Judgments reversed.

SMITH, J., concurs.

Mr. PRESIDING JUSTICE CRAVEN dissenting:

I must respectfully disagree with the majority conclusion that the factual circumstances thoroughly set forth in the majority opinion lead to the conclusion under the authorities that as a matter of law neither the Maryland Casualty policy nor the Iowa National policy afforded coverage under the circumstances here found. The trial court concluded coverage as a matter of law; the majority now determine absence of coverage as a matter of law. Within the contemplation of the rule of *Pedrick*, the existence of coverage as to Maryland Casualty was, I believe, a factual issue for the jury.

The Iowa National policy provided coverage under the language quoted in the majority opinion and that language is, as the majority notes, one that contemplates a subjective test. I believe the trial court was in error in determining as a matter of law that Horton "reasonably believed" that he was driving the Buick automobile with the permission of Robert Smythe. The evidence was such, however, that had this matter been submitted to and that same determination made by a jury, such could be sustained by the evidence.