THE NATIONAL HOLLOW BRAKE-BEAM COMPANY *et al.*

*v.*

THE CHICAGO RAILWAY EQUIPMENT COMPANY.

*Opinion filed February 21, 1907.*

CORPORATIONS—*what is not a binding payment of rent to corporation.* An agreement between the president and the treasurer of a corporation to unload upon the corporation certain notes and paper known by them to be worthless, by endorsing them to the corporation without recourse and crediting them as part payments upon the rent due to the corporation under a lease, is not binding upon the corporation, and no estoppel upon its part to repudiate the transaction can arise in the absence of proof of knowledge or acquiescence in the transfer.

APPEAL from the Branch Appellate Court for the First District;—heard in that court on appeal from the Superior Court of Cook county; the Hon. M. KAVANAGH, Judge, presiding.

The pleading and facts of the case are sufficiently stated in the following statement made by the Appellate Court:

"On March 21, 1902, the Chicago Railway Equipment Company, appellant, filed its bill in the superior court of Cook county to enjoin the National Hollow Brake-Beam

Company and Henry D. Laughlin, appellees, from re-entering upon the premises occupied by appellant and removing it, or any of its property, therefrom, and to restrain Laughlin, as president of the brake-beam company, from acting under the power conferred upon him by the lease, from seizing the books and papers of appellant, and from undertaking to secure and deliver to the brake-beam company an assignment and transfer of patents and inventions for which applications for patents are pending, choses in action or any other property belonging to appellant.

"The material allegations of the bill are to the effect that on January 1, 1893, appellant took possession of all the property, business and good will of the brake-beam company under an agreement called a lease, dated December 8, 1892. Under this agreement appellant was to pay the brake-beam company the sum of $65,000 per year, in semi-annual installments, for the period of fifteen years. The lessee assumed the payment of $50,000 of the mortgage bonds of the lessor and the interest thereon. At the expiration of the lease the lessee was to return the property leased, and, if it had not already done so, the amount of cash received from the lessor or the balance thereof still unpaid, the outstandings turned over to it, together with the amount of the cash price, as per inventory, of the stock and materials on hand, manufactured and unmanufactured, turned over by the lessor to the lessee. The lessee had the right, from time to time, to pay back to the lessor, before the expiration of the lease, the whole or any portion of the money received by it or that may be collected on the outstandings in the payment of not less than $5000. As such payments were made from time to time the rents should be reduced thereafter per annum in an amount equal to six percentum on the amount or amounts so paid back. The lease provides for a forfeiture in case the lessee should fail to pay any installment of rent for three months after it became due, the forfeiture to be declared after giving a written notice of such intention to the

lessee, and after receiving such notice the lessee has three months from the date of the receipt of the notice to make good its default. The lease further provides for a re-entry and the removal of the lessee in case of forfeiture, and gives the lessor the right to take possession of the premises, together with the machinery and stock and material, manufactured and unmanufactured, all cash on hand, in bank or elsewhere, notes, accounts, choses in action, all books and papers and evidences of indebtedness, and provides that the lessor shall thereupon succeed immediately to the right, title and interest of the lessee. The lessor is to account to the lessee, and after liquidating all claims of the lessor against the lessee it shall pay over to the lessee any balance in its hands. It is further provided therein that the lessor shall become the owner of all patents and inventions owned by the lessee, with all claims for infringement of any such rights, and makes the president of the lessor the attorney in fact of the lessee, to execute and deliver to the lessor all necessary assignments and transfers thereof, without any charge in any sum whatever for the same.

"On March 16, 1898, appellee Laughlin sent a communication to appellant referring to a certain proposition which he had submitted in April, 1897, relating to a reduction of the rent reserved in the lease. In this communication Laughlin submitted a new proposition upon the same subject, and among other things said that the item of $106,287.90, referred to in the original proposition, had been returned to appellee brake-beam company, and that appellant had made good to the brake-beam company all the moneys acquired by appellant through the lease, but that appellant still stands charged with machinery and office furniture accounts amounting to $16,294.90. Laughlin then proposed to appellant that if it would pay to the American Trust and Savings Bank of Chicago, for his account, $107,000 cash and $300,000 of its negotiable bonds, he would have its rent reduced from the amount it was then paying to $5000 per

annum thereafter, and that until he secured such reduction he himself would pay to the brake-beam company all rent over and above the sum of $5000 per annum.   This proposition was accepted by appellant, and appellant paid the money and turned over the bonds in the fall of 1898, in accordance with the agreement.   Appellee Laughlin in the meantime had entered into an agreement with the brake-beam company whereby it consented to the reduction of the appellant's rent to $5000 per annum in consideration of certain agreements on the part of Laughlin to purchase at par all the stock of the beam company held by all stockholders other than himself.   A certificate was thereupon given by the beam company to the equipment company evidencing an agreement to the reduction of the rent to $5000, beginning January 1, 1899, which was to be paid in semi-annual installments of $2500 each.

"On December 31, 1898, the balance of the rent due for the year, amounting to the sum of $21,500, was paid by appellant to the beam company by turning over a note of appellee Laughlin for $7500, a note of the El Nayal M. & M. Company for $4000, a note of the Hammond Manufacturing Company for $5000, and a certificate of the receiver of the Monterey and Mexican Gulf Railroad for $4500.   On December 18, 1901, appellee Laughlin delivered a notice to appellant that the turning over of the last three items was no payment, in fact, of the rent, and unless the balance of $13,500 represented by said papers, with six per cent interest from December 31, 1898, was paid within three months, the appellee the brake-beam company intended to forfeit the lease.

"The bill sets up efforts to have the controversy settled amicably;  that the capital stock of appellant is $2,500,000 and worth at least $1,000,000;  that in the development of its business it has acquired a large number of patents;  that it has accumulated a surplus of more than $100,000, and that it has paid dividends for the year 1901 at six per cent

on its capital stock; that the break-beam company threatens to take forcible possession of its property and to secure an assignment of all its letters patent, and thus irreparably damage and destroy its property and business, and prays for an injunction against a forfeiture of its lease, etc.

"The amended answer of appellee the brake-beam company denies that the rent in dispute has been paid, or that the three obligations for $13,500 were taken or accepted as cash, or otherwise, by the brake-beam company; alleges that the pretended transfer of the three obligations was attempted to be made by Edward B. Leigh, who was at the time thereof general manager of the equipment company; that Leigh had, prior to the time of the pretended transfer, used the moneys of the equipment company for his own private purposes and for such moneys so taken the three obligations had been given, and that on December 31, 1898, the said claims were worthless. At that time Leigh was in charge of the books of the brake-beam company, and being about to become treasurer of the beam company, fraudulently, for the purpose of imposing said worthless claims upon the beam company and in the interest of the equipment company, and without the knowledge of the officers and directors of the beam company, made certain entries on the latter company's books pretending to transfer to it the said worthless claims in part payment of the installment of rent due December 31, 1898; that Leigh had no authority to make such entries; that they were not known to the brake-beam company, and as soon as known to it were by it repudiated; that the equipment company was ignorant of such pretended transfer, but was afterwards informed thereof and of Leigh's fraud, and then ratified the fraud by insisting on the transfer.

"In the fall of 1902 leave of the court was obtained to serve further notices upon the equipment company for alleged non-payment of rent, and on September 29, 1902, the beam company served two notices upon the equipment com-

pany, claiming that of the installment of rent due December 31, 1898, there was still unpaid the sum of $1200, and of the installment of rent due for the year 1897 there was unpaid the sum of $6337. The $1200 item represented six per cent interest on two notes, of $10,000 each, made by Atkins & Milligan and one Burgess, and turned over on December 31, 1897, to Calhoun, treasurer of the brake-beam company. The $6337 item was for six percentum interest upon $106,287.90 which had not been turned over until the end of the year 1897.

"A supplemental bill was then filed by appellant setting up the service upon it of these notices, charging that these claims were fictitious, and an injunction was granted thereon restraining the beam company from declaring a forfeiture of the lease pursuant to the notices. The supplemental bill was also answered by appellees, appellee Laughlin setting up in his pleadings the same facts as the beam company's answer, and the case being at issue was referred to a master for his findings of fact and conclusions of law thereon. Upon the report of the master being made, appellant filed objections, which were ordered to stand as exceptions. The exceptions were overruled by the court and the master's report confirmed, the court in its decree finding, in effect, that the transfer of the two notes for $10,000 each, and the three items amounting to $13,500, were fraudulent, and decreed that there is due from appellant to the beam company the sum of $19,624.50, with interest, and gave appellant ten days from the date of the decree to pay the money into court for the benefit of the beam company, and that in default of such payment appellees are given leave to proceed with the forfeiture of the lease and the injunction be dissolved."

In the above statement the Chicago Railway Equipment Company is spoken of as the appellant and the National Hollow Brake-Beam Company and Henry D. Laughlin as appellees, the parties being reversed in this court.

The Appellate Court reversed the decree of the superior court and remanded the case, with directions to grant the prayer of the bill for a perpetual injunction against the hollow brake-beam company.

SHOPE, MATHIS, ZANE & WEBER, and EDDY, HALEY & WETTEN, for appellants.

H. H. C. MILLER, W. S. OPPENHEIM, and DAVID S. GEER, for appellee.

Mr. JUSTICE FARMER delivered the opinion of the court:

The controlling questions for determination are, whether the equipment company has proven that the note of the El Nayal M. & M. Company for $4000, the draft of the Hammond Manufacturing Company for $5000, and the certificate of the receiver of the Monterey and Mexican Gulf Railroad Company for $4500, called hereinafter the "three items," were received by the brake-beam company in part payment, to the amount of $13,500, of the rental which fell due December 31, 1898, and whether the Atkins & Milligan notes for $20,000 were received in part payment of the balance of the $106,287.90 theretofore advanced by the brake-beam company to the equipment company. That these notes, the draft and the receiver's certificate were uncollectible is shown by the testimony, and we think it sufficiently appeared they were each entirely worthless.

The Atkins & Milligan notes, it is claimed, constituted valid re-payment of the amount or sum which the equipment company was not bound to pay until 1908, but on which the lease provided payments in sums not less than $5000 might be made at any time, and when made should reduce the annual rental by an amount equal to the interest on such partial payments at the rate of six per cent. On the theory the notes were transferred to and received by the brake-beam company as such payment, the annual rental due for 1898

was reduced in the sum of $1200, being six per cent on the amount of these two notes. The makers of these notes are insolvent. Leigh testified that Laughlin consented to loaning the money for which the notes were given, and that the notes might be placed among the assets of the brake-beam company as valid payments of the advancement. Laughlin denied he so consented or agreed. Leigh was interested in having these notes paid or used by the equipment company as good notes, for he was responsible to the equipment company for them. Laughlin had no interest in their payment. The master and the chancellor, in view of the direct conflict in the testimony of these two witnesses, regarded the alleged consent as not proven, and, moreover, held that the brake-beam company could not be bound by Laughlin's consent, even if it were proven he consented. We know of no reason why the testimony of Leigh should have greater weight than that of Laughlin, and think the view of the chancellor should, on this point, have been accepted by the Appellate Court. The paper was worthless, known to be so by both Leigh and Laughlin, and even if they had consented and agreed to foist it on the brake-beam company, of which Laughlin was president and general manager and Leigh was treasurer, such an agreement was not enforcible as a matter of law or of right. Leigh and Laughlin were large holders of the stock of the brake-beam company, but had no power, as stockholders, to act for and bind the company. *Hopkins* v. *Roseclare Lead Co.* 72 Ill. 373.

The El Nayal M. & M. Company note, the Hammond Manufacturing Company draft and the certificate of the receiver of the Monterey and Mexican Gulf Railroad Company, with which it was claimed the $13,500 rental due for the year 1898 was paid, were shown by the evidence to be worthless. These "three items" found their way into the treasury of the brake-beam company in the following manner: Leigh became treasurer of the brake-beam company in January, 1899. He was the general manager of the

equipment company. Some time afterward, the exact date not being shown with certainty, Leigh, as manager of the equipment company, placed the El Nayal company note, endorsed without recourse, in an envelope with the brake-beam company papers. The receiver's certificate had been sent to Mexico for collection, and the Hammond company note had been reduced to judgment in Leigh's name and was on file in the papers of the case in the court where the judgment was entered. Leigh, as treasurer of the brake-beam company, made entries on the treasurer's books of the brake-beam company to show that the "three items" were transferred by the equipment company to the brake-beam company in part payment for rent which fell due at the close of the year 1898, and without recourse on the equipment company. Leigh again testified that Laughlin, who was president of the brake-beam company, knew of the transfer of these "items" to the brake-beam company at par and without recourse on the equipment company. His testimony was, that Laughlin said to him, "We are going to make the brake-beam company the sewer to take care of these personal matters of ours or these mining matters of ours." Leigh testified he knew these claims were "bad debts." It also appeared he had an individual interest in "unloading them" in order to relieve himself of personal liability, as endorser or otherwise, because of their non-payment. Laughlin denies the statement attributed to him. But the "three items" were worthless, were known to the equipment company to be so, and also to Laughlin, and the act of Leigh, as treasurer of the brake-beam company, in receiving them from himself, as manager of the equipment company, and entering them on the books of the brake-beam company as having been received in payment of an indebtedness due from the equipment company, could not receive legal sanction. Nor would the act have any greater validity if the transfer were made, as testified to by Leigh, under an agreement between himself and Laughlin,

in their respective official capacities, that the treasury of the brake-beam company should be converted into a sewer for the reception of the "bad debts" of each of them.

But it is insisted that the other stockholders, officers and directors of the brake-beam company knew of the alleged transfer of these "three items" to the brake-beam company in partial payment of the rental due from the equipment company for the year 1898, and also knew of the transfer of the Atkins & Milligan notes, and acquiesced in the transaction, and should be held estopped at this late date to deny the validity of the alleged payment. The Appellate Court accepted this as the correct view and for that reason reversed the decree of the circuit court.

There was an agreement between Leigh and Laughlin that certain notes, of which a written list was made, should be transferred from the equipment company to the brake-beam company, to be taken as payment on rental. Laughlin endorsed his consent to the acceptance of these notes on the written list of them. This list was not produced, and the evidence of Leigh and Laughlin as to whether the "three items" in dispute, or the Atkins & Milligan notes, were included in it is in conflict. In February, 1900,—perhaps about the 8th,—Leigh rendered to Laughlin a statement of the assets of the hollow brake-beam company, among the items being the Monterey and Mexican Gulf Railroad Company, $25,158.48, El Nayal M. & M. Company, $4000, and Hammond Manufacturing Company, $7353.81. At this time Laughlin had obtained control of the greater part of the stock of the brake-beam company, and regarded himself as practically entitled to all the assets of the company under the operation of the "rent reduction" contract which Laughlin entered into with the equipment company and brake-beam company, under which he purchased the greater part of the stock of the brake-beam company. This report was rendered for the personal information of Laughlin. Laughlin, within a short time after receiving the statement, wrote

Leigh for information as to the El Nayal notes of $4000, and said further, "I think I am sufficiently familiar with the other items to enable me to figure intelligently." Laughlin insists he repudiated the El Nayal note as soon as he was advised as to it. It seems certain he did not consent that it constituted a part of the assets of the brake-beam company. He also denied that the Hammond item constituted part of the assets of the brake-beam company. Laughlin knew the brake-beam company held claims against the Monterey and Mexican Gulf Railroad Company to the extent of more than $20,000,—indeed, to probably $25,000 if interest should be computed thereon. But this contested item of $4500 was older in date and earlier in maturity than any of such of those claims of which he had knowledge, and the account did not disclose that it had been included in the total of the items as found in the statement. If it was included, then it is clear the statement did not include interest on the other of the claims against the Mexican company, which it is conceded on all hands belonged to the brake-beam company and which were interest-bearing obligations. We do not think it can be declared from this statement it should be held Laughlin had notice of the inclusion of the contested Monterey and Mexican Gulf Railroad Company item as part of the assets of the brake-beam company and acquiesced therein.

It is urged the entries made by Leigh on the treasurer's books of the brake-beam company, a report made by the auditing committee of that company on November 7, 1890, certain "trial balances" of the assets of the brake-beam company January 18, 1899, February 1, 1900, and October 1, 1901, should be held to show knowledge and acquiescence on the part of Laughlin and the brake-beam company to the alleged transfer of these "three items" under consideration to the brake-beam company. In the master's report, which was approved by the chancellor, we find the following statements: "I do not give these book entries and documents the same weight as estopping the defendant company as

such book entries would usually have, because of the extra-
ordinary relations of Leigh and Laughlin, the latter leaving
everything to Leigh, and because Mr. Leigh remained at all
times in the custody of all these books and papers and of the
notes themselves, the other corporation officers giving no
heed to the contents of the books or to the actual condition
of the assets.  *  *  *  I find that the entries in the books,
trial balances and records of the defendant concerning these
last three items were made by Leigh or under his directions,
and that the extraordinary confidence and lack of business
checks between Leigh and Laughlin in all these transactions,
the fact that Leigh had sole custody of all books and docu-
ments and sole control of all details, and the fact that all
details of management in the defendant company were left
solely to him, takes away from these records and documents
their weight as evidence against the defendant company and
prevents their acting as an estoppel.  These entries may well
have been made in good faith and still they could not bind
the corporation.  Any statements that Judge Laughlin ac-
quiesced to the transfer of these three last items are denied
by him.  He denies that he had any knowledge of the trans-
fer or that the books showed the items."  The trial court
found and recited in its decree, as abstracted:  "The entries
were made without the knowledge of the brake-beam com-
pany and its proper officers, and the acts of Leigh were done
in the interest of Leigh and the complainant and could not
be of benefit to the brake-beam company.  None of these
acts of Leigh were approved and ratified by the brake-beam
company, and the assumed transfer was not, in law, a trans-
fer of the title and not binding upon the brake-beam com-
pany, and was not a return of the sum of $20,000."

After an investigation of the record we think these find-
ings of the master and chancellor are correct conclusions to
be drawn from the proofs.  Neither knowledge nor acquies-
cence on the part of the brake-beam company of the alleged
transfer to it of the worthless "three items" in payment,

in part, of the obligation of the equipment company being proven, no estoppel to repudiate the same could arise, hence we conclude that the decree of the chancellor was correct and should have been affirmed by the Appellate Court.

The judgment of the Appellate Court is therefore reversed and the cause will be remanded to the superior court, with directions to enter a decree finding there is due to the brake-beam company from the equipment company the sum of $19,624.50, together with interest on that amount at five per cent per annum from the date of the former decree rendered in that court, and decreeing the payment thereof within thirty days, and that in default the injunction be dissolved.

The judgment of the Appellate Court is reversed and the cause remanded to the superior court, with directions.

*Reversed and remanded.*