HARRIS TRUST & SAVINGS BANK *et al.*, Co-Ex'rs of the Estate of Herbert W. Rumsfeld, Deceased, Plaintiffs-Appellees, *v.* JOANNA-WESTERN MILLS COMPANY, Defendant-Appellant.

First District (2nd Division)   No. 62182

Opinion filed September 27, 1977.

STAMOS, J., dissenting.

William M. Ward and David M. Hartigan, both of Hartigan & Ward, of Chicago, for appellant.

Hinshaw, Culbertson, Moelmann, Hoban & Fuller, of Chicago (D. Kendall Griffith, William J. Holloway, and Kenneth W. Olsen, of counsel), for appellees.

Mr. JUSTICE MEJDA delivered the opinion of the court:

Plaintiffs, Harris Trust & Savings Bank and Dorothy A. Rumsfeld, as co-executors of the estate of Herbert W. Rumsfeld, commenced this action following decedent's death in 1973 against defendant, Joanna-Western Mills Company, seeking specific performance of a stock redemption agreement allegedly entered into by decedent and defendant on February 17, 1949. The trial court denied defendant's motion for summary judgment and granted plaintiffs' motion for summary judgment, whereby defendant was ordered to perform pursuant to the terms of the redemption agreement.

Defendant appeals from the decree for specific performance and presents the following issues for review: (1) whether the trial court erroneously denied defendant's motion for summary judgment; (2) whether a genuine issue of fact was raised by the pleadings mandating a denial of plaintiffs' motion for summary judgment; (3) whether the trial

court could have properly found against defendant on the grounds of estoppel, ratification and laches even though these defenses were not specifically pleaded by plaintiffs; (4) whether defendant was improperly denied an opportunity to fully exploit discovery procedures by the rulings of the trial court; and (5) whether the decree for specific performance is free from doubt. We affirm the denial of defendant's motion for summary judgment, reverse the granting of plaintiffs' motion for summary judgment, and remand.

The contract upon which this action is predicated was executed on February 17, 1949, and provides in pertinent part as follows:

> "3. *Purchase by Joanna on Rumsfeld's Death.* Upon Rumsfeld's death, Rumsfeld's heirs, executors or administrators shall sell to Joanna and Joanna shall purchase Rumsfeld's shares (less all such shares he may have disposed of pursuant to the terms hereof during his lifetime) at the contract price per share. Such shares shall be transferred and delivered to Joanna not later than three (3) months after Rumsfeld's death and Joanna shall pay the said price therefor upon delivery to it of merchantable title to such shares."

In addition to creating by the contract a market for Rumsfeld's stock upon his death, defendant was granted a right of first refusal as to any shares of stock which Rumsfeld may have desired to dispose of during his lifetime. The terms "contract price per share" and "Rumsfeld's shares" were defined in the agreement, the latter term encompassing "all shares now owned by Rumsfeld and all shares thereafter acquired by him." Along with Rumsfeld's signature, the agreement was signed on behalf of defendant by its president, William F. Regnery, and the execution of the contract was attested to by defendant's secretary, R. H. Jackson. All three persons signing the contract were members of defendant's board of directors on the date of execution.

It was alleged in the complaint that Rumsfeld performed in accordance with the redemption agreement and that upon his death plaintiffs tendered to defendant the 325 shares of stock then owned by Rumsfeld but that defendant refused to redeem the stock pursuant to the terms of the contract. Plaintiffs contended that they were without an adequate remedy at law, and therefore, they sought specific performance of the redemption agreement.

Defendant filed several responsive pleadings to the complaint, and four principal defenses were advanced: that the officers who purported to act on behalf of defendant when the contract was executed did so without the requisite authority to bind the corporation; that the unauthorized, executed contract was never ratified by either the shareholders or the board of directors of the corporation; that Rumsfeld, as a member of the board of directors, owed a fiduciary duty to defendant to disclose the

underlying circumstances and terms of the contract and seek ratification thereof, but such duty was breached; and that the terms of the agreement are unfair and inequitable to defendant. Defendant also advanced the equitable defenses of laches and unclean hands.

The record discloses that defendant was operated as a close corporation with the ownership and control thereof vested in principal part in the Regnery and Volker families. In 1949, defendant's board of directors was comprised of seven members, including William H. Regnery and four of his sons. Rumsfeld, a member of the Volker family, became associated with a parent company in 1924 and then was an officer of the corporation until his resignation in 1958. He continued as a member of the board of directors until his death in 1973. Also, as an employee of the corporation in 1949, Rumsfeld served as the General Superintendent of defendant's Chicago plant at which he had supervisory authority over 700-800 employees who were engaged in the manufacture of diversified textile products.

Some 24 years elapsed from the date on which this redemption agreement was executed and Rumsfeld's death. During that time period, the membership on defendant's board of directors underwent numerous changes. In fact, by 1973 none of the directors involved with the negotiation and execution of the contract was alive; W. H. Regnery, W. F. Regnery, and R. H. Jackson died prior to 1960. Of the six directors who voted to repudiate the contract, however, the record reveals that each of them acquired full knowledge of the Rumsfeld agreement by no later than 1967.

Shortly after Rumsfeld's death in 1973, plaintiff tendered the 325 shares of stock owned by Rumsfeld to defendant and requested that defendant redeem the stock pursuant to the contract. Rumsfeld had not purchased these shares under the redemption agreement, but rather had apparently purchased them from an uncle and already owned them when the agreement was executed. On November 19, 1973, defendant's board of directors considered plaintiffs' request and, finding a lack of authorization for or ratification of the agreement contained in the corporate records, repudiated the redemption agreement. This action followed.

OPINION

Section 57(3) of the Civil Practice Act (Ill. Rev. Stat. 1973, ch. 110, par. 57(3)) provides that summary judgment is appropriate "* * * if the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment or decree as a matter of law." Thus, summary judgment is proper when the issue is determinable solely as a question of law. *Sidwell v. Sidwell* (1975), 28 Ill.

App. 3d 580, 328 N.E.2d 595; *Applicolor, Inc. v. Surface Combustion Corp.* (1966), 77 Ill. App. 2d 260, 222 N.E.2d 168.

■■■ In ruling on a motion for summary judgment, the trial court must construe the pleadings, depositions and affidavits included therein most strictly against the moving party and most liberally in favor of the opponent. (*Baier v. State Farm Insurance Co.* (1975), 28 Ill. App. 3d 917, 329 N.E.2d 543; *Lumbermens Mutual Casualty Co. v. Poths* (1968), 104 Ill. App. 2d 80, 243 N.E.2d 40.) Inferences may be drawn from the facts which are not in dispute, and if fair-minded persons could draw different inferences from these facts then a triable issue exists. (*Farmer's Automobile Insurance Association v. Hamilton* (1975), 31 Ill. App. 3d 730, 335 N.E.2d 178, *aff'd*, 64 Ill. 2d 138, 355 N.E.2d 1 (1976); *McHenry Sand & Gravel, Inc. v. Rueck* (1975), 28 Ill. App. 3d 460, 328 N.E.2d 679.) The right of a party to summary judgment must be clear and free from doubt. (*McHenry Sand & Gravel, Inc. v. Rueck; Dakovitz v. Arrow Road Construction Co.* (1975), 26 Ill. App. 3d 56, 324 N.E.2d 444.) Thus, where doubt exists as to the right of the moving party to entry of a summary judgment, the wiser judicial policy is to permit resolution of the dispute by trial rather than by summary judgment. *National Bank v. S.N.H., Inc.* (1975), 32 Ill. App. 3d 110, 336 N.E.2d 115; *Wegener v. Anna* (1973), 11 Ill. App. 3d 316, 296 N.E.2d 589.

Application of the foregoing principles in the instant case mandates that the trial court's grant of summary judgment in favor of plaintiffs be reversed, and this cause be remanded for a trial on the merits. In our view, triable issues of fact exist both as to the authorization for, or ratification of the instant agreement, and as to the fairness of the instant agreement.

Both parties correctly state that Delaware law is applicable to the instant case. The pertinent Delaware statute provides as follows:

"(a) No contract or transaction between a corporation and one or more of its directors or officers, or between a corporation and any other corporation, partnership, association, or other organization in which one or more of its directors or officers are directors or officers, or have a financial interest, shall be void or voidable solely for this reason, or solely because the director or officer is present at or participates in the meeting of the board or committee which authorizes the contract or transaction, or solely because his or their votes are counted for such purpose, if:

(1) The material facts as to his relationship or interest and as to the contract or transaction are disclosed or are known to the board of directors or the committee, and the board or committee in good faith authorizes the contract or transaction by the affirmative votes of a majority of the

disinterested directors, even though the disinterested directors be less than a quorum; or

(2) The material facts as to his relationship or interest and as to the contract or transaction are disclosed or are known to the shareholders entitled to vote thereon, and the contract or transaction is specifically approved in good faith by vote of the shareholders; or

(3) *The contract or transaction is fair as to the corporation as of the time it is authorized, approved or ratified, by the board of directors, a committee thereof, or the shareholders.*

(b) Common or interested directors may be counted in determining the presence of a quorum at a meeting of the board of directors or of a committee which authorizes the contract or transaction." (Emphasis added.) Del. Code Ann. 1974, tit. 8, §144.

Thus, by the terms of section 144(a)(3) any transaction between a corporation and one of its directors apparently need not be fully disclosed in order for it to be valid; however, the fairness of any such transaction to the corporation at the time of its approval must be affirmatively shown by the individual attempting to enforce the contract. The burden of proof rests on the interested parties when "fairness" alone can sustain the transaction. (E. L. Folk, *Review of the Delaware Corporation Law for the Delaware Corporation Law Revision Committee*, at 72-73 (1968).) This fairness requirement shall be dealt with more fully in following portions of today's opinion.

In its memorandum opinion, the trial court, based on what it viewed as uncontroverted facts, stated several conclusions of law, any one of which would constitute just grounds for granting plaintiffs' motion for summary judgment. This court, therefore, on review, must consider the correctness of each of these particular findings.

Initially, the trial court found that the action taken by the board of directors at a meeting conducted on October 28, 1960, constituted a ratification of the agreement. The court based its conclusion in this regard on a letter to one of the directors, Morris A. Cox, dated May 5, 1966. This letter was from Charles Kimball, a director and the general counsel of defendant. It listed 19 names, including Rumsfeld, with which defendant had some type of stock agreement. This letter also stated, in pertinent part:

"I call your attention to the minutes of the Board of Directors' meeting of October 28, 1960. * * *. At that meeting the existence of the past agreements was discussed and we were all aware of the agreements covering the shares which were issued as a result of the conversion of the Class "B" stock. I recall your comments at the time to the effect that we all realized that agreements had been

entered into in the past which we had to live with and that what we should be concerned with was that no further agreements be entered into without the action being approved by the Board of Directors."

Based on this letter, the trial court found that the "failure of the board to repudiate the agreement at this meeting of October 28, 1960 constituted a ratification." We conclude, however, that such a finding was not proper upon a motion for summary judgment. The facts regarding this 1960 directors' meeting are not uncontroverted, and reasonable persons might well draw a different conclusion based on such facts.

The pleadings and documents of record do not establish as a matter of law that all of the directors knew of the Rumsfeld agreement at their 1960 meeting. Indeed, Kimball states in his affidavit that he was not aware of the agreement until after the 1960 meeting and that the agreement was never discussed, nor its existence disclosed, during the 1960 meeting. Likewise, other directors, in their depositions, denied knowledge of the agreement until a date sometime subsequent to the 1960 meeting. Furthermore, the minutes of the meeting itself disclose no discussion of the agreement. Rather, the minutes merely reveal that:

"The chairman then stated that a recent search of the corporate records revealed the absence of any minutes reflecting the prior action of the Board of Directors at the meeting of December 11, 1950, which authorized the sale of Treasury stock to key employees of the corporation, some of whom have not yet completed payments therefor, and all of which stock is now held subject to special agreements heretofore executed between the corporation and the employees. The chairman stated that it was desirable that an addition to the minutes of that meeting be now authorized."

The board then passed a resolution causing such an addition to be made, authorizing the President to enter "sale and buy-back" stock redemption agreements with key employees.

The inferences and conclusions to be drawn from such evidence are varied. In addition to that reached by the trial court, reasonable minds might conclude that Kimball's letter merely indicated that the board was aware in 1960 that some agreements existed with *some* employees. In any event, it does not irrefutably indicate that the directors specifically had knowledge of the Rumsfeld agreement in 1960, and to hold such upon summary judgment was error.

Absent uncontroverted proof that the directors had knowledge of the agreement in 1960, clearly the court could not properly conclude further upon summary judgment that the directors ratified it by their silence, or failure to repudiate it. Knowledge of the allegedly

unauthorized agreement is a requisite before any ratification by silence may be inferred. (See *Roth v. Ahrensfeld* (1940), 373 Ill. 550, 27 N.E.2d 445; *Freeport Journal-Standard Publishing Co. v. Frederick W. Ziv Co.* (1952), 345 Ill. App. 337, 103 N.E.2d 153; 19 Am. Jur. 2d *Corporations* §1254 (1965).) As noted, such knowledge is not uncontrovertibly established by the documents of record in the instant case, and neither may such knowledge be imputed in the instant case under the general rule that knowledge of the contents of the corporate files and records will be presumed in its directors. (See *Roth v. Ahrensfeld.*) Such a presumption is only indulged in favor of third parties, and not for fellow directors or officers. (2 Fletcher Cyclopedia Corporations §§756, 757 (perm. ed. 1969) (hereinafter cited as Fletcher).) Since Rumsfeld was a director of defendant during this entire period, this presumption of knowledge of the contents of the corporate records would not act in his favor.

■■ In addition, other requisites, which are considered more fully in further portions of today's opinion, also must exist before the doctrine of estoppel, or ratification by silence, may apply; *e.g.*, detrimental reliance by the third party. (See 19 Am. Jur. 2d *Corporations* §1254 (1965); 2 Fletcher §769; see also *Allstate Insurance Co. v. National Tea Co.* (1975), 25 Ill. App. 3d 449, 323 N.E.2d 521.) Assuming *arguendo*, therefore, that the directors did all have knowledge of the agreement at the 1960 meeting, these other requisites must then be considered. In this case, these matters too would appear to be pre-eminently questions of fact not appropriately decided upon summary judgment. Lastly, we would note that assuming *arguendo* all the necessary requisites for ratification by silence existed in 1960, the fairness requirement of section 144(a)(3) would still have to be met.

■■ The second conclusion of law reached by the trial court was that W. H. Regnery, as the chief operating executive of defendant, "had implied authority to negotiate and conclude an agreement with Rumsfeld, a key employee, without specific authorization by the board of directors." This would only be a proper conclusion, however, if the Rumsfeld agreement could be considered a transaction in the usual and ordinary business of the corporation. (*Italo-Petroleum Corp. v. Hannigan* (1940), 40 Del. 534, 14 A.2d 401; *Quigley v. W. N. Macqueen & Co.* (1926), 321 Ill. 124, 152 N.E. 487.) Once again, the inferences to be drawn from all the evidence in this regard could differ.

Defendant's certificate of incorporation provides in part as follows:

"THIRD: The nature of the business, or objects or purposes to be transacted, promoted or carried on are * * * to purchase, hold, sell and transfer the shares of its own capital stock * * *."

In addition, by statute defendant is authorized to purchase its own stock. (Del. Code Ann. 1974, tit. 8, §160(a).) Such provisions, however, do not

establish that board authorization was not necessary for the Rumsfeld agreement.

■■ While the record reveals no specific requirement of authorization prior to execution of the agreements, it does reveal that other stock agreements were retroactively authorized by the board. On March 15, 1941, a board meeting authorized the president to *sell* treasury stock to key employees. On November 2, 1953, the board specifically discussed and authorized the president to buy back the stock of another substantial stockholder. In 1956, and again in 1957, the board met to adopt resolutions allowing the sale of Class B stock to key employees. In 1960, the board met to ratify the sale and buy-back agreements of its common stock entered into by the company and key employees between 1951 and 1959. Such evidence could be construed as indicating an intention by the board to either approve or ratify stock sales and purchase agreements with employees. If so, one possible inference would be that the Rumsfeld agreement also necessitated specific approval or authorization, especially since it was not a "sale and buy-back" agreement, but at most a purchase agreement, and thus somewhat similar in nature to the November 2, 1953, transaction. While all these board actions did occur subsequent to execution of the Rumsfeld agreement, we note that Rumsfeld was a director during this time and participated at these meetings. Therefore, a possible inference is that Rumsfeld should have been aware from the board's actions that his agreement too needed some type of "retroactive" authorization, similar to that executed for the 1951 and 1959 transactions. At the least, the question of the necessity for specific authorization is clearly a question of fact whose determination upon summary judgment is singularly inappropriate. Furthermore, assuming *arguendo* that W. H. Regnery was authorized to enter this agreement in 1949, the fairness of the agreement to the corporation as of that 1949 date must still be determined.

The final portions of the trial court's opinion set forth a number of alleged reasons why defendant would be estopped from denying ratification of the agreement. Essentially, the court found that the failure of the directors to repudiate the agreement upon discovering its existence amount to an implied ratification of the agreement.

■■ Implied ratification of a previously unauthorized act "may result from (1) accepting and retaining the benefits of the act or contract, (2) silence or acquiescence, or (3) other affirmative acts showing an adoption of the act or contract." (2 Fletcher §767, at 1093-94.) The trial court in the instant case found that the first two bases for implied ratification existed as a matter of law, and thus defendant could not now repudiate or deny ratification of the agreement. Such a conclusion, while supported by some of the evidence of record, was improper upon a motion for summary

judgment. The question of implied ratification in the instant case is one of fact, deserving of a full trial on its merits.

■■ It is undisputed in the instant case that all of the directors knew of the Rumsfeld agreement by 1967. They did not act to repudiate it at any time subsequent to that date, until after Rumsfeld died in 1973. While such inaction *may* well constitute evidence from which ratification may be inferred, it does not establish the existence of such ratification as a matter of law. Other requisites, in addition to inaction, must be met before this doctrine may take effect, and it is these other requisites which present questions of fact in the instant case.

■■ Ratification may not be inferred "from acts readily explainable without being accompanied by an intention to ratify." (19 Am. Jur. 2d *Corporations* §1244 (1965).) In the instant case the conversations and actions by the board certainly exhibit no intent to ratify the agreement through their silence, and *may* be explained by their belief that the contract was not enforceable. Nonetheless, they may indeed be estopped from now repudiating the agreement if the plaintiff establishes, among other things, that Rumsfeld relied upon such inaction to his detriment. The rule is succinctly stated as follows:

> "Moreover, silence and failure to repudiate which does not harm the opposite party does not constitute ratification by estoppel. Where such a ratification is sought to be established by a third person, it must clearly appear that he has been *misled thereby, or induced to forego some advantage he would have otherwise enjoyed*. Accordingly, it is held that the duty promptly to disaffirm unauthorized acts, on knowledge thereof being acquired, is less imperative, or does not exist, where the corporation has received no benefit from the acts and no loss is caused to the other party and his position is not in any way changed by the failure to notify him." (Emphasis added.) 2 Fletcher §769, at 1106. See also 2 Fletcher §752, at 1042; 19 Am. Jur. 2d *Corporations* §1254, at 661 (1965).

■■ The trial court in the case at bar concluded that Rumsfeld refrained from offering his stock to a competitor "at a price perhaps even higher than the book value of the stock." While such a finding might constitute detrimental reliance by Rumsfeld, as well as a benefit to the corporation, there is no evidence in the record that Rumsfeld ever had the opportunity to sell his stock for such an inflated price. Indeed, such a finding is controverted by the court's further finding that "[w]ithout an agreement, upon his death, his [Rumsfeld's] family would have been at the mercy of the corporation because there was no outside market for the sale of his stock." Further adjudication of this issue is required.

In addition, assuming *arguendo* that Rumsfeld did rely on the validity of the agreement in refraining from selling his stock, the question of

detriment must be considered. After a full hearing the court might well conclude that whatever price Rumsfeld could have sold his stock at between 1949 and 1973, is matched or exceeded by the prices available for the stock today. If so, then the reliance may not have worked any loss to plaintiff. In any event, this too is clearly a question of fact.

Finally, assuming further that *detrimental* reliance is proven, the further question exists of whether Rumsfeld was *misled* into such reliance. As noted previously, Rumsfeld was a member of the board during the entire 24-year period from 1949 to 1973. He was present at all the meetings wherein other employee stock purchase-and-sale agreements were discussed and authorized. It is a question of fact whether Rumsfeld should have therefore been aware that his agreement needed to be disclosed and approved. If such were the case, then Rumsfeld could not have been misled into any allegedly detrimental reliance upon the validity of the agreement.

We next turn to the issue of implied ratification by acceptance and retention of the benefits of the previously unauthorized transaction. Under this theory, the question of fact to be determined in the instant case is what benefit defendant accepted during its period of inaction concerning the Rumsfeld agreement.

The benefit pointed to by the trial court was that Rumsfeld adhered to the agreement and refrained from selling his stock outside the corporation. We have previously noted that Rumsfeld's retention of the stock based on the agreement is not established by the record as a matter of law. In addition, however, the mere fact that Rumsfeld did not sell his stock is not, in our view, the type of benefit envisioned by this rule of law.

■■ Generally, the rule would appear to be most clearly applicable where the proceeds of a transaction have been accepted and used by a corporation. (See generally 2 Fletcher §773; 19 Am. Jur. 2d *Corporations* §1255 (1965).) It is stated that "[i]f benefits have been accepted, the corporation cannot disaffirm the contract without returning or offering to return the benefits received or otherwise placing the other party to the contract in statu quo." (2 Fletcher §773, at 1122-23.) Thus, the ratification by retention of benefits rule does not apply "if the principal receives a benefit the return of which is not possible." (2 Fletcher §773, at 1123-24.) The alleged benefit derived by Rumsfeld's retention of his stock would certainly appear to fall within such a classification.

■■ It is undisputed in the instant case that defendant received no direct monetary benefit from the Rumsfeld agreement, since Rumsfeld did not purchase his stock from the corporation under the agreement. However, an indirect benefit may be sufficient to support the rule (2 Fletcher §773, at 1124) and the trial court in this case indicated that

Rumsfeld "undoubtedly contributed to the growth of the corporation in his capacity as manager of its largest division." Such a contribution of services rendered to increase defendant's growth could support invocation of the rule in this case. However, questions of fact exist in this regard. The evidence is controverted both as to whether this stock agreement was meant to be an incentive plan, and as to whether Rumsfeld during the years following the agreement did in fact materially contribute to defendant's growth. Certainly these issues are not properly decided upon a motion for summary judgment.

Plaintiff presents in its brief to this court yet a fourth theory of ratification. While not expressly ruled on by the trial court, the facts alleged in support of this contention were before the court, and under such circumstances an appellee is entitled to urge any point on appeal in support of its judgment. *Shaw v. Lorenz* (1969), 42 Ill. 2d 246, 246 N.E.2d 285.

Plaintiff contends that the agreement was ratified by a stockholder vote in 1949. At their annual meeting on June 27, 1949, the shareholders voted a general approval of the actions of the directors and officers for the fiscal year ending March 31, 1949. The Rumsfeld agreement had been entered into during that period. While conceding that not all the shareholders were aware of the agreement when the vote occurred, nonetheless plaintiff contends that under section 144(a)(3) this vote acted to effectively ratify the agreement. We must disagree.

A reading of section 144 of title 8 of the Delaware Code certainly supports the conclusion that *full* disclosure of an agreement is not necessary in order for it to be valid. Both 144(a)(1) and (2) require disclosure of (a) the agreement, and (b) the director's interest in that agreement before effective ratification can occur. In our view 144(a)(3) is meant to be effective in those instances where the agreement is known, but the individual director's interest in that agreement is not disclosed. In the instant case, since the existence of the agreement was not disclosed, we do not believe the shareholder vote could act to ratify it even assuming it was fair to the corporation.

To hold otherwise would pervert the statute. The terms "authorized, approved or ratified," used in 144(a)(3) imply at least *some* knowledge of what is being approved or ratified. (See 19 Am. Jur. 2d *Corporations* §§1244, 1245 (1965); 2 Fletcher §§756, 764.) In our view, the wording of the Delaware statute indicates that, in the instant case, the shareholders would have to have known that they were ratifying a stock redemption agreement, and what its terms were, but would not have had to know of director Rumsfeld's interest in the agreement for their ratification to be effective. This, of course, also assuming that the agreement was fair to the corporation on that date. Since the shareholders did not know of the

agreement in 1949, their boilerplate approval does not act to ratify it even under 144(a)(3). See generally 19 Am. Jur. 2d *Corporations* §1252, at 659 (1965).

We next turn to the issue of fairness under 144(a)(3). If upon remand, the trial court finds that the agreement was ratified by the corporation either in 1960 or after 1967, a question still exists concerning the fairness of the agreement to the corporation. In its memorandum opinion in this case, the court concluded as a matter of law that the agreement was fair as of its date of execution, February 17, 1949. Such a finding was error upon a motion for summary judgment. In our view, the fairness of the agreement is a question of fact, and in addition, that fairness must be determined as of the date of its ratification, not the date of its execution.

The trial court based its finding of fairness on the fact that book value was a reasonable price term to use in dealing with stock of a closely-held corporation, and that Rumsfeld in return restricted his right to sell his stock outside the corporation. While such factors must indeed be considered, other considerations make such a determination of fairness inappropriate upon summary judgment.

The standard of fairness under Delaware law in transactions involving interested directors is stated as being "whether the proposition submitted would have commended itself to a wholly independent board of directors." (E. L. Folk, The Delaware General Corporation Law—A Commentary and Analysis 86 (1972); *Johnston v. Greene* (1956), 35 Del. Ch. 479, 121 A.2d 919.) This standard is usually applied where the interested directors participate in the ratification of the agreement, and thus represent both their individual and the corporation's interests. (Folk, at 86; *Johnston v. Greene*; see also *Sinclair Oil Corp. v. Levien* (Del. 1971), 280 A.2d 717.) Plaintiff argues that such a standard is not applicable since Rumsfeld only represented himself, while the corporation was represented by Jackson and the two Regnerys. Yet, to the extent Rumsfeld's silence about the agreement can, in part, be held responsible for the turn of events leading to an alleged ratification by silence, such a standard might still be applicable. This issue has not been argued or proved up before the trial court, however, and therefore we will venture no positive statements on it at this time.

Assuming *arguendo* that the facts do not support application of the aforementioned standard, the court must then at least determine that the agreement conformed to the "business judgment rule," namely that the directors' "ratification" can be attributed to any rational business purpose. Folk, at 76; *Sinclair Oil Corp. v. Levien*; *Gottlieb v. Heyden Chemical Corp.* (1952), 33 Del. Ch. 177, 91 A.2d 57.

In determining the fairness of this agreement to the corporation the benefits to both parties must be weighed. The instant agreement is

somewhat similar in effect to stock option agreements given key personnel in other Delaware caselaw. In such cases, the Delaware courts have stated that not only must consideration pass to the corporation but it must be of sufficient value so that the terms of the agreement are not so unequal as to amount to waste. (*Beard v. Elster* (1960), 39 Del. Ch. 153, 160 A.2d 731; see also *Gottlieb v. Heyden Chemical Corp.*) In the instant case, the facts do not yet establish such fairness as a matter of law. The benefit to Rumsfeld is clear in that at death he had a guaranteed market and price for his stock, but the benefit to the corporation is more elusive. The fact that Rumsfeld restricted his right to sell his shares to outsiders is a benefit, but must be weighed in light of the fact that he only owned 325 out of over 8000 outstanding shares. In addition, such a benefit must be weighed in light of the court's previously noted finding that "[w]ithout an agreement, upon his death, his [Rumsfeld's] family would have been at the mercy of the corporation *because there was no outside market for the sale of his stock.*" (Emphasis added.) If no outside market existed during Rumsfeld's life also, then the benefit to the corporation in this regard would be illusory. Certainly, the terms of the agreement would not be equal. All these factors, along with many others, must be considered by the court in a trial on the merits of this case. Suffice it to say that a conclusion of fairness upon summary judgment was error.

The court also erred in determining the fairness of the agreement as of its date of execution. Section 144(a)(3) indicates that fairness must be determined as of the date of ratification. Thus, assuming *arguendo* the court finds that the agreement was ratified, the fairness must be determined as of that particular date.

We are cognizant of those cases which indicate that the subsequent ratification of an unauthorized agreement relates back to the date of the agreement. (*Hannigan v. Italo-Petroleum Corp. of America* (1945), 43 Del. 333, 47 A.2d 169.) Such a rule dispenses with any necessity of showing a previous authority for the act. (See 2 Fletcher §782; *Hannigan v. Italo-Petroleum Corp.*) However, to apply this rule of relation back in determining the fairness of the contract would, in our view, be in contravention of the plain meaning of the statute. In construing the meaning of a statute the courts must look to the plain and ordinary meaning of the language used by the legislature. (*In re Leyden Fire Protection District* (1972), 4 Ill. App. 3d 273, 280 N.E.2d 744; *Blough v. Ekstrom* (1957), 14 Ill. App. 2d 153, 144 N.E.2d 436.) If the legislature had intended the date of fairness to relate back they could have easily worded the statute to indicate so; *e.g.*, "fairness as of the date of execution," or just "the fairness of the agreement," which could easily be construed as intending application of the doctrine of relation back. A statute should be construed so that no word, clause, or sentence is rendered meaningless or

superfluous. (*People ex rel. Barrett v. Barrett* (1964), 31 Ill. 2d 360, 201 N.E.2d 849; *Martin v. Orvis Brothers & Co.* (1974), 25 Ill. App. 3d 238, 323 N.E.2d 73.) Thus, our conclusion that the date of ratification should be the date at which the fairness of the agreement is determined.

Our research reveals only two brief statements directed to this particular problem under 144(a)(3). Professor Ernest Folk makes the general statement that the transaction must be deemed fair "as to the corporation as of the time it is made." (E. L. Folk, Review of the Delaware Corporation Law for the Delaware Corporation Law Revision Committee 71 (1968).) In most instances the date of execution, ratification, and "making" will somewhat closely coincide. However, in the instant case the agreement was not "made" until either ratified, approved, or authorized sometime after 1949. The Delaware statute thus judges "the fairness of the transaction at the time it was *approved*." (Emphasis added.) (1 Model Business Corporation Act Annotated §41, par. 3.02, at 846 (2d ed. 1971).) Therefore, in the instant case, if the court determines upon remand that W. H. Regnery was authorized to conclude this agreement on behalf of the corporation in 1949, then that is the date at which its fairness should be determined. Otherwise, if the court finds ratification of the agreement in 1960 or after 1967, that later date should be used in calculating fairness.

The final issue with which we must deal concerns the scope of discovery allowed by the court in the instant case. In the Rumsfeld estate's Illinois inheritance tax return, the fair cash market value of the stock subject to this agreement is stated as $60,753.33. Defendant deposed an officer of the Harris Trust & Savings Bank, one of the co-executor plaintiffs in this case, on this matter. The witness refused to answer questions related to this matter on the advice of counsel, and the court denied defendant's motion to compel answers.

■■ The right of discovery is limited to disclosure regarding matters relevant to the subject matter involved in the pending action. (Ill. Rev. Stat. 1975, ch. 110A, par. 201(b)(1).) The trial court has wide discretion in controlling discovery and that discretion is not abused by denying discovery of a subject not relevant to the subject matter of the action. (*Cohn v. Board of Education* (1970), 118 Ill. App. 2d 453, 254 N.E.2d 803.) Plaintiffs contend that the inheritance tax valuation is clearly irrelevant since the agreement settled upon book value as the contract price.

■■ While we agree that the sought-after information is not relevant to the contract price to be paid, we find that it may indeed be relevant to other issues in the case. Particularly, the present fair market value of the stock would seem relevant in determining whether, under the previously noted rules of ratification by silence, Rumsfeld's estate has suffered any

loss due to his alleged reliance on the contract. In such regards a comparison of the market value during Rumsfeld's lifetime with the present market value would be both relevant and useful. Likewise, the ability to sell the stock outside the corporation would seem relevant to the issue of the fairness of the agreement, since the value of the consideration given defendant (*i.e.*, restricting his right to sell outside the corporation) must be weighed against the value of the consideration given up by the corporation. Thus, discovery on this issue should be allowed upon remandment of this cause.

Accordingly, the order denying defendant's motion for summary judgment is affirmed; the order granting plaintiffs' motion for summary judgment is reversed, and the cause remanded to the circuit court of Cook County for further proceedings not inconsistent with this opinion.

Affirmed in part; reversed in part; and remanded.

McGLOON, J., concurs.

Mr. JUSTICE STAMOS, dissenting:

I would affirm the judgment of the circuit court of Cook County.

As noted by the majority, the record discloses that defendant was operated as a close corporation with the ownership and control thereof vested, in principal part, in the Regnery and Volker families. In 1949, defendant's board of directors was comprised of seven members, including William H. Regnery and four of his sons. Rumsfeld, a member of the Volker family, became associated with a parent company in 1924 and then was an officer of the corporation until his resignation in 1958. He continued as a member of the board of directors until his death in 1973. Also, as an employee of the corporation in 1949, Rumsfeld served as the General Superintendent of defendant's Chicago plant at which he had supervisory authority over 700-800 employees who were engaged in the manufacture of diversified textile products.

In 1948, William H. Regnery, who served as defendant's vice-president in addition to being a member of the board of directors, requested one of defendant's attorneys, Paul Tatge, to draft the redemption agreement in question. By deposition in this case, Tatge stated that W. H. Regnery related to him in 1948 "that it was the consensus among the members of the Regnery family who held the stock in JOANNA-WESTERN that it should not be publicly disposed of and there should be some restriction upon the employees' sale of the stock owned in the company." W. H. Regnery further advised Tatge that the purpose of the redemption agreement "was to provide incentive to Mr. Rumsfeld by providing a

market for the stock and at the same time to restrict the disposition of the stock and keep it within the Regnery family."

Some 24 years elapsed from the date on which this redemption agreement was executed and Rumsfeld's death. Shortly after his death, plaintiffs tendered the shares of stock owned by Rumsfeld to defendant and requested that defendant redeem the stock pursuant to the contract. On November 19, 1973, defendant's board of directors considered plaintiffs' request and, finding a lack of authorization for or ratification of the agreement contained in the corporate records, repudiated the redemption agreement. This action followed.

When ruling on the parties' respective motions for summary judgment which were accompanied by supporting affidavits, the trial court had before it the pleadings of record, the written and oral arguments of counsel, depositions, answers to written interrogatories, and responses to various requests to admit facts. In its memorandum opinion, the trial court stated several conclusions of law, including the findings that W. H. Regnery, as the chief operating executive of the corporation, had implied authority to negotiate and conclude the redemption agreement with Rumsfeld on behalf of the corporation without the need for specific authorization from the board of directors, and that the action taken by the board of directors at a meeting conducted on October 28, 1960, constituted a ratification of the acts of the officers who purported to act on behalf of defendant when the contract was executed.

In my estimation, we need not dwell on the correctness of these particular findings by the trial court. After examining all matters of record, I respectfully submit that, under the circumstances of this case, the equitable principle of estoppel operates to preclude defendant from disaffirming or otherwise repudiating the redemption agreement.

The rationale of the Illinois Supreme Court in *Roth v. Ahrensfeld* (1940), 373 Ill. 550, 554-55, 27 N.E.2d 445, 447, is applicable to the instant case. In *Roth*, the court noted:

> "Determination of the question of defendant's liability rests in the final analysis on whether defendant's directors or stockholders, other than Jones, had full knowledge of the disputed sale during the year and one-half it remained unchallenged on defendant's records. Even though the defendant originally could have avoided the sale, it has lost that privilege if it later acquiesced in the transaction. (*Golden v. Cervenka*, 278 Ill. 409.) Defendant does not deny that its delay in disaffirming should be interpreted as approval, except by its contention that the other officers and stockholders had no knowledge of Jones' transaction during the intervening period. A president is not disqualified from dealing

with the corporation he represents, though his contracts with the corporation may be disaffirmed and will be set aside if tainted with the slightest unfairness. (*Dixmoor Golf Club v. Evans*, 325 Ill. 612.) If there is any delay in repudiating, the court will inquire whether avoidance will cause an injustice to any one. (*Higgins v. Lansingh*, 154 Ill. 301.) Although no rights of third persons would be prejudiced, such a contract, nevertheless, will be upheld if by affirmative ratification or by actions amounting to acquiescence the corporation has adopted it. (*Louisville, New Albany and Chicago Railway Co. v. Carson*, 151 Ill. 444.) When the corporation, through its disinterested officers or stockholders, has been completely informed of the contract over a long period of time and has not indicated its disapproval in any way, it may be concluded that the president's action has been adopted. (*Ashley Wire Co. v. Illinois Steel Co.* 164 Ill. 149; *Beach v. Miller*, 130 id. 162.) Acquiescence thus inferred binds the corporation, preventing later disaffirmance. (*Louisville, New Albany and Chicago Railway Co. v. Carson*, supra.) The knowledge of the corporation may be determined from pertinent testimony of the officers or stockholders, or, if the corporate records contain a full disclosure and were available to the other stockholders and directors during the period in question, it will be presumed. *Dixmoor Golf Club v. Evans*, supra; *Nat. Hollow Brake-Beam Co. v. Chicago Railway Equipment Co.* 226 Ill. 28; *Ashley Wire Co. v. Illinois Steel Co.* supra."

Similarly, in *Freeport Journal-Standard Publishing Co. v. Frederic W. Ziv Co.* (1952), 345 Ill. App. 337, 350, 103 N.E.2d 153, 158-59, it was held:

"A corporation can act only through its agents. As stated in 13 Am. Jur. 935, sec. 983: 'The acquiescence of a corporation which will amount to ratification of an unauthorized act may be evinced by mere silence under circumstances giving rise to a duty to repudiate the transaction; a corporation cannot stand by, after it has learned of an unauthorized act or contract made or entered into by its officer or agent, and have its benefit if it should prove to be favorable and reject it if it should prove unfavorable.' "

Due to the length of time between the date of execution of the Rumsfeld agreement and the date on which that contract was repudiated, the membership on defendant's board of directors underwent numerous changes. In fact, by 1973 none of the directors involved with the negotiation and execution of the contract were alive; W. H. Regnery, W. F. Regnery and R. H. Jackson died prior to 1960. Of the six directors who voted to repudiate the contract, the record reveals that each of them acquired full knowledge of the Rumsfeld agreement by no later than

1967. F. L. Regnery, who served as president of the corporation in 1973, acquired knowledge of the contract from defendant's accounting department in the early 1960's when the contract was discovered in the corporate files. He related this information to Henry Regnery shortly thereafter, but he refrained from discussing the contract with Rumsfeld because he did not know if a copy of the contract had ever been delivered to Rumsfeld. Furthermore, he was fearful that if the Rumsfeld agreement was enforced, other employees would seek similar concessions.

Morris Cox was advised in 1966 of the existence of the Rumsfeld agreement. At that time, he received a letter from another director who also served as general counsel for defendant. In this letter, the concern of other board members was expressed, particularly regarding the disparity between the contract price and the fair market value of the stock. The letter concluded "Perhaps if W. H. [Regnery] were here to defend his actions, he might do so on the basis that Herb Rumsfeld was an employee for many years and may very well have contributed to the growth of the company and for this reason he was more than just an investor."

David Meyers first learned of the contract from Walter Regnery in the early 1960's. Although he discussed the situation with other members of the Regnery family, he never discussed the contract with Rumsfeld.

The other two members of the board of directors who voted to repudiate the agreement acquired knowledge of the contract in 1967. They discussed the situation with defendant's independent auditors and decided that the contract should not be referred to in the corporation's annual audit report since they questioned the validity of the contract and desired to prevent this potential corporate liability from coming to the attention of the readers of the audit. It was decided that defendant would take no action with regard to the Rumsfeld agreement, but rather, defendant would await any action on the part of Rumsfeld's estate following his death.

Thus, from the date on which the entire board of directors became aware of the existence and the terms of the Rumsfeld agreement, more than 7 years elapsed before the board undertook formal action to repudiate the contract. At no time was the contract discussed with Rumsfeld. Instead, the directors engaged in a course of conduct calculated to conceal their opposition to the contract in expectation either that the contract had never been delivered to Rumsfeld, or that the representatives of Rumsfeld's estate would be unable to enforce the contract upon his death.

It was the imperative duty of the defendant toward its shareholders to repudiate the agreement entered into by W. H. Regnery if it were unauthorized. Silence under such circumstances that, according to the ordinary expressions and habits of men, one would naturally be expected

to speak if he did not consent, is evidence from which ratification can be found. (*Freeport Journal-Standard Pub. Co. v. Ziv Co.*) For us to hold otherwise and permit defendant to avoid its obligation under the terms of the agreement would also cause great injustice to decedent's estate.

I acknowledge that questions of ratification and estoppel normally present issues of fact to be determined by the trier of fact, and thus, are not normally subjects for summary judgment. However, where, as in the instant case, all matters of record, together with any inferences to be drawn therefrom, lead to only one conclusion, a question of law is raised for the court's determination. (2 Fletcher Cyclopedia Corporations §781 (perm. ed. 1969).) Consequently, the trial court's rulings on the parties' respective motions for summary judgment, in my estimation, were proper.